REED SMITH LLP
Paul E. Breene, Esq.
599 Lexington Avenue
New York, NY 10022
Telephone:  (212) 521-5400
Facsimile:  (212) 521-5450
pbreene@reedsmith.com

Paul M. Singer, Esq.
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
Telephone:  (412) 288-3131
Facsimile:  (412) 288-3063
psinger@reedsmith.com

Attorneys for the Debtor and
Debtor in Possession

CAPLIN & DRYSDALE,
CHARTERED
Peter Van N. Lockwood, Esq.
Jeffrey A. Liesemer, Esq.
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone:  (202) 862-5065
Facsimile: (202) 429-3301
plockwood@capdale.com
jliesemer@capdale.com

Attorneys for the Asbestos
Claimants Committee

YOUNG CONAWAY
STARGATT & TAYLOR, LLP
Edwin J. Harron, Esq.
Sara Beth A. R. Kohut, Esq.
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:  (302) 571-6703
Facsimile:  (302) 576-3298
eharron@ycst.com
skohut@ycst.com

Attorneys for the Future
Claimants' Representative

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

In re:                                                          :
                                                                :   Chapter 11
                                                                :
METEX MFG. CORPORATION,                                         :
(f/k/a Kentile Floors, Inc.),                                   :   Case No. 12-14554 (CGM)
                                                                :
                                    Debtor.                     :
---------------------------------------------------------------- x

## DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN OF REORGANIZATION OF METEX MFG. CORPORATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

*The Plan of Reorganization, attached hereto as Exhibit 1, provides for an "Asbestos PI Channeling Injunction" pursuant to section 524(g) of the Bankruptcy Code and an "Insurance Policy Injunction" pursuant to section 105 of the Bankruptcy Code.  For a description of the causes of action to be enjoined and the identities of the entities that would be subject to the injunction, see Section IX.D of this Disclosure Statement and Article XI of the Plan.*

## SUMMARY OF THE PLAN OF REORGANIZATION
## AND THE ASBESTOS PI TRUST DISTRIBUTION PROCEDURES

**A.      Introduction.**

Metex Mfg. Corporation ("Metex" or the "Debtor"), formerly known as Kentile Floors, Inc., the Asbestos Claimants Committee, and the Future Claimants' Representative (collectively, the "Plan Proponents") are soliciting votes for the acceptance of the Plan from holders of Asbestos PI Claims. *Please refer to Article I of the Plan for definitions of terms used but not defined in this Disclosure Statement.*

On June 29, 2012, Metex began solicitation of a Prepackaged Plan of Reorganization (the "Prepackaged Plan"). Although an overwhelming majority of holders of Asbestos PI Claims voted in favor of the Prepackaged Plan, Metex fell short by less than 1% of the dollar value of Asbestos PI Claims necessary to confirm the Prepackaged Plan. Accordingly, on November 9, 2012, Metex commenced this Chapter 11 Case and is now proposing the Plan which is the subject of this Disclosure Statement.[1]

The Plan contemplates the establishment of a trust under section 524(g) of the Bankruptcy Code (as defined in the Plan, the "Asbestos PI Trust") and an injunction (specifically, the Asbestos PI Channeling Injunction) that will channel to the Asbestos PI Trust all current Claims and future Demands for asbestos-related personal injury and wrongful death based in whole or in part on the alleged conduct or products of Kentile Floors, Inc. ("Kentile"), a New York corporation whose name was changed to Metex Mfg. Corporation in 1998. The injunction will also channel all current Claims and future Demands based in whole or in part upon asbestos-related personal injury and wrongful death Claims and Demands against certain parties related to Metex, including, but not limited to, certain named affiliates of Metex, past and present officers and directors of Metex, and any entity that owned a financial interest in Metex. Additionally, the Asbestos PI Channeling Injunction will protect ten insurers who have agreed to fund the Asbestos PI Trust pursuant to an Insurance Settlement Agreement.[2]

Since 2000, based upon information provided to Metex by Kentile's insurers who have managed Kentile's asbestos claims in the tort system, approximately 10,000 Kentile asbestos-related personal injury and wrongful death claims have been resolved through settlement or dismissal. Those insurers further advised that approximately 6,000 active Asbestos PI Claims and over 20,000 inactive Asbestos PI Claims against Kentile are outstanding as of the

---

[1]    In connection with the Prepackaged Plan, Metex engaged MFR Claims Processing, Inc. ("MFR") to review claims in anticipation of a successful outcome. Although MFR received several thousand claims, none was processed prior to the voting deadline on the Prepackaged Plan when MFR was directed to cease further work.

[2]    Nine Settling Asbestos Insurance Entities will make payments directly to the Asbestos PI Trust. Federal Insurance Company, an insurer whose policies previously had been exhausted, agreed to assign certain contribution rights against The Home Insurance Company to the NYLB Escrow in exchange for the benefits of the Asbestos PI Channeling Injunction and the Insurance Policy Injunction.

date hereof.  The purpose of the Plan is to provide for the resolution of all such existing Asbestos PI Claims and future Demands, pursuant to section 524(g) of the Bankruptcy Code.

All Claims other than Asbestos PI Claims are unimpaired by the Plan.  The holders of such Claims are directed to other portions of this Disclosure Statement and to the Plan for a discussion of the treatment of such Claims.

## B.    The Channeling Injunction and the Insurance Policy Injunction.

*The Asbestos PI Channeling Injunction to be issued under the Plan will cover Asbestos PI Claims and Demands against Metex and Reorganized Metex, as well as Asbestos PI Claims and Demands against Metex Related Parties, based on any purported liability arising from their ownership of or relation to Metex, parties that have a right of indemnity against Metex, and parties that have actual or alleged liability with respect to Asbestos PI Claims or Demands in each case related to or arising from the conduct or products of Kentile that purportedly caused asbestos-related personal injury or wrongful death, including any claim based upon a theory of veil piercing, alter ego, successor liability, fraudulent conveyance or conspiracy.  The Asbestos PI Channeling Injunction will also protect the Settling Asbestos Insurance Protected Parties.*

*The effect of "channeling" Asbestos PI Claims and Demands to the Asbestos PI Trust is that they may be pursued through, and paid from, only the Asbestos PI Trust, in accordance with the Asbestos PI Trust Distribution Procedures; Asbestos PI Claims or Demands may not be asserted against Metex, Reorganized Metex, Metex Related Parties, the Settling Asbestos Insurance Protected Parties, or any current or former Representative or Shareholder of those entities.*

*In addition to providing the Settling Asbestos Insurance Protected Parties with the benefit of the Asbestos PI Channeling Injunction, the Plan provides for the issuance of an Insurance Policy Injunction that will protect the Settling Asbestos Insurance Protected Parties from any Claims or suits arising from or attributable to the insurance relationship between Metex and such Entities as more fully described in Article 11.6 of the Plan.*

## C.    Contributions to Asbestos PI Trust.

The Asbestos PI Trust will be funded with between $182.1 million and $189.75 million (in nominal dollars) to be paid by the Settling Asbestos Insurance Entities less sums, if any, used to fund the administrative costs of this Chapter 11 Case under an arrangement between Liberty Mutual Insurance Company ("Liberty Mutual") and Metex.  Copies of the agreements with those Settling Asbestos Insurance Entities are attached to the Plan as Exhibits C-1 to C-10.  On the Effective Date, for its part, Metex will issue a $250,000, 10-year promissory note to the Asbestos PI Trust and will  release to the Asbestos PI Trust $750,000 from the NYLB Escrow.  (See Section VIII.B. below for details of the funding of the Asbestos PI Trust.)

The Asbestos PI Trust Assets described above are limited and thus must be managed by the Asbestos PI Trustee to ensure that funds are available to pay all current asbestos claimants as well as all expected future asbestos claimants.  For all the reasons detailed in this

Disclosure Statement, Metex believes that there will be substantially more assets available to pay asbestos claimants under the Plan than would be the case if there were no Plan because, among other reasons, the Settling Asbestos Insurance Entities are contributing significant assets to the Asbestos PI Trust as part of the Plan in exchange for the protections provided by the Asbestos PI Channeling Injunction which would not be contributed otherwise.  Moreover, without the distribution procedures in the Plan, there likely would be years of costly and time-consuming litigation involving asbestos claimants that will be avoided through the Plan's orderly administrative process.  Absent the Plan, distributions to asbestos claimants would be delayed and, due to the costs of litigation, the funds actually available for asbestos claimants would be reduced.  For this and other reasons explained in detail herein, Metex believes that each of the holders of asbestos-related personal injury and wrongful death Claims who are entitled to vote should vote to accept the Plan.

---

**RECOMMENDATION:**

**Metex, the Asbestos Claimants Committee and the Future Claimants' Representative believe that the Plan provides a fair and reasonable recovery to current claimants and Future Demand Holders and that acceptance of the Plan is in the best interests of all claimants and Demand holders.  Accordingly, Metex, the Asbestos Claimants Committee and the Future Claimants' Representative urge you to vote to accept/in favor of the Plan.**

**Please note that if there is any inconsistency between the Plan and the descriptions in the Disclosure Statement, the terms of the Plan will govern.**

---

**D.    How Asbestos Claimants Receive Distributions from the Asbestos PI Trust.**

1.    *The Asbestos PI Trust Distribution Procedures.*

The goal of the Asbestos PI Trust is to treat all present and future asbestos claimants similarly and equitably and in accordance with the requirements of section 524(g) of the Bankruptcy Code.  Under the Plan, to further that goal, the Asbestos PI Trust will resolve Asbestos PI Claims in accordance with the "Asbestos PI Trust Distribution Procedures," the form of which is attached to the Plan as Exhibit B and is incorporated herein by reference.  The Asbestos PI Trust Agreement provides that the Asbestos PI Trust will make payments to holders of Asbestos PI Claims pursuant to the Asbestos PI Trust Distribution Procedures while maintaining sufficient resources to pay future valid Asbestos PI Claims on a substantially equivalent basis.

(a)    *Disease Categories and Scheduled and Maximum Values.*

The Asbestos PI Trust Distribution Procedures establish a schedule of eight asbestos-related diseases ("Disease Levels"):  (i) Mesothelioma (Disease Level VIII), (ii) Lung Cancer 1 (Disease Level VII), (iii) Lung Cancer 2 (Disease Level VI), (iv) Other Cancer (Disease Level V), (v) Severe Asbestosis (Disease Level IV), (vi) Asbestosis / Pleural Disease

(Disease Level III), (vii) Asbestosis / Pleural Disease (Disease Level II), and (viii) Other Asbestos Disease (Disease Level I).

To qualify for payment, claimants must submit specific medical and exposure evidence as provided in the Asbestos PI Trust Distribution Procedures.

The Asbestos PI Claim values for each Disease Level are set forth below.[3]  The Asbestos PI Trust Distribution Procedures also provide values for "Extraordinary Claims" (as that term is defined in the Asbestos PI Trust Distribution Procedures) that exceed those set forth below.

| Level | Disease Category | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|---|
| VIII | Mesothelioma | $135,000 | $175,000 | $330,000 |
| VII | Lung Cancer 1 | $65,000 | $78,000 | $100,000 |
| VI | Lung Cancer 2 | NONE | $15,000 | $25,000 |
| V | Other Cancers | $17,500 | $20,000 | $25,000 |
| IV | Severe Asbestosis | $65,000 | $78,000 | $100,000 |
| III | Asbestosis/Pleural Disease | $5,500 | NONE | NONE |
| II | Asbestosis/Pleural Disease | $2,500 | NONE | NONE |
| I | Other Asbestos Disease | $100 | NONE | NONE |

(b)    *Review and Payment of Claims under the Asbestos PI Trust Distribution Procedures.*

The Asbestos PI Trust Distribution Procedures provide that claims generally will be processed in "First In, First Out" ("FIFO") order so that the oldest claims will be processed first.

Asbestos PI Claims will be processed through either the "Expedited Review Process" or the "Individual Review Process" provided for in the Asbestos PI Trust Distribution Procedures.  The "Expedited Review Process" is intended to provide an expeditious, efficient and inexpensive method for liquidating Asbestos PI Claims based on the assigned, disease-specific "Scheduled Value" applicable to the Asbestos PI Claim as set forth in the schedules contained in the Asbestos PI Trust Distribution Procedures and as set forth in the table above. Pursuant to the Asbestos PI Trust Distribution Procedures, claimants (other than those alleging Disease Level VI (Lung Cancer 2) and those holding Asbestos PI Claims based on exposure to asbestos outside of the United States and Canada, which may be liquidated only pursuant to the Individual Review Process) will have the option to submit their Asbestos PI Claims through the Individual Review Process to pursue a value in excess of "Scheduled Value" or to seek approval of a claim that does not satisfy the presumptive medical and exposure criteria.  A claimant alleging Disease Levels I-V, VII and VIII that does not meet the presumptive medical and exposure criteria for the relevant Disease Level may be offered an amount up to the Scheduled

---

[3]    The figures presented here represent claim values for settlement purposes only.  The parties reserve all rights with respect to actual claim values in the event the Plan is not confirmed.

Value of that Disease Level if the Asbestos PI Trust is satisfied that the claim would be cognizable and valid in the tort system.

Claimants also have the option of engaging in binding or nonbinding arbitration to establish their Asbestos PI Claims, but only after they have completed the Individual Review Process, in accordance with Alternative Dispute Resolution Procedures to be adopted by the Asbestos PI Trust in accordance with the provisions of the Asbestos PI Trust Documents. The arbitrator may return awards only in accordance with the values set forth in the Asbestos PI Trust Distribution Procedures. Only if a claimant elects nonbinding arbitration and rejects the arbitration award may the claimant then litigate in court against the Asbestos PI Trust to establish its claim. Awards in litigation will be paid as specifically provided in the Asbestos PI Trust Distribution Procedures.

As a condition to making payment to a claimant with respect to an Asbestos PI Claim, the Asbestos PI Trust shall obtain, for the benefit of the Asbestos PI Trust and the Asbestos Protected Parties, a release of liability with respect to the claimant's Asbestos PI Claim.

Prior to receiving a distribution from the Asbestos PI Trust, a claimant will also be requested to certify that the claimant will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or related rules or regulations, or guidelines, in connection with, or relating to, such Asbestos PI Claims as required by the Medicare, Medicaid and SCHIP Extension Act of 2007 ("MMSEA").

2.    *Maximum Annual Payment.*

Aggregate distributions to claimants in each year shall not exceed a "Maximum Annual Payment" amount determined for that year. The Asbestos PI Trust shall determine the Maximum Annual Payment for each year by modeling the cash flow, principal, and income year-by-year to be paid over the Asbestos PI Trust's entire life in a manner designed to ensure that all present and future holders of Asbestos PI Claims are compensated in an amount equal to the liquidated value of their respective Asbestos PI Claims multiplied by the payment percentage. If there are insufficient funds to pay Asbestos PI Claims in any year, the unpaid Claims will be carried over for priority payment in the next year.

3.    *Application of the Payment Percentage.*

Except for Asbestos PI Claims involving Other Asbestos Disease (Disease Level I – Cash Discount Payment), all Asbestos PI Claims paid by the Asbestos PI Trust are subject to the payment percentage. The payment percentage is the percentage of the full liquidated value of a claim that claimants will receive from the Asbestos PI Trust. The claimant will receive a payment equal to the payment percentage multiplied by the liquidated value of the claim.

There can be no certainty as to the precise amounts that will be distributed by the Asbestos PI Trust in any particular time period or when Asbestos PI Claims will be paid by the Asbestos PI Trust. Payments that will be made on Asbestos PI Claims will be determined under the Asbestos PI Trust Distribution Procedures and will be based, on the one hand, on estimates of the number, types, and amount of current Asbestos PI Claims and expected future Demands, and on the other hand, on the value of the assets of the Asbestos PI Trust, the liquidity of the

Asbestos PI Trust, the Asbestos PI Trust's expected future income and expenses, and other matters that are likely to affect the sufficiency of funds to pay all holders of Asbestos PI Claims.

The initial payment percentage has been set at 18% and was developed by comparing the assets of the Asbestos PI Trust against its projected liability for Asbestos PI Claims and Asbestos PI Trust Expenses. The Asbestos PI Trust's projected liability for Asbestos PI Claims is based on a number of assumptions, including the assumption that the rate at which the Asbestos PI Trust approves claims for payment will remain consistent with the rate at which the Debtor previously settled and paid Asbestos PI Claims. Should any assumption from which the initial payment percentage was developed prove to be materially inaccurate based on the Asbestos PI Trust's actual experience, the Asbestos PI Trust may have to adjust the payment percentage upwards or downwards from time to time, pursuant to the provisions of the Asbestos PI Trust Distribution Procedures and the Asbestos PI Trust Agreement, to reflect current estimates of the Asbestos PI Trust's assets and liabilities.

4.    *Proposed Trustee of the Asbestos PI Trust.*

Charles A. Koppelman has been proposed as the initial Asbestos PI Trustee. Mr. Koppelman is currently serving as a trustee of ASARCO LLC Asbestos Personal Injury Settlement Trust, the United States Gypsum Asbestos Personal Injury Settlement Trust, the T. H. Agriculture & Nutrition, LLC Asbestos Personal Injury Trust, and the Quigley Company, Inc. Asbestos Personal Injury Trust. Mr. Koppelman was proposed as initial Asbestos PI Trustee under the Debtor's Prepackaged Plan. In addition, it is contemplated that Wilmington Trust Company will become the corporate trustee of the Asbestos PI Trust.

**E.    Reorganized Metex's Business.**

Metex owns two industrial properties in Edison, New Jersey, which are under lease to affiliates of Metex. The leases expire in 2033 (but may be terminated earlier upon notice by the tenant), are triple net leases, and generate approximately $750,000 per year in revenue for Metex. Both properties are subject to ongoing environmental remediation which consumes a portion of those revenues.

**F.    Summary of Classification and Treatment under the Plan.**

The Plan classifies Claims against and Equity Interests in Metex for all purposes, including voting, Plan confirmation, and Claims distribution, as set forth in the table below. The table also sets forth the proposed treatment for each Class and identifies which Classes are entitled to vote. Unless otherwise indicated, the characteristics and amounts of the Claims or Equity Interests are based on the books and records of Metex as of the date hereof. The table is only a summary of the classification and treatment under the Plan of Claims and Equity Interests, and reference should be made to the entire Disclosure Statement and the Plan for a complete description of each classification and treatment.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claim(s) | Estimated Recovery |
|---|---|---|---|---|---|
| N/A | Administrative Expense Claims and Administrative Expense Claims of Professionals | Payment in full (or as otherwise agreed) for Administrative Expense Claims.<br><br>Payment from designated accounts for Administrative Claims of Professionals. | No | Ordinary Course Administrative Claims – $0; Professional Administrative Claims – Unknown | 100% |
| N/A | Priority Tax Claims | Payment in full on the Effective Date, or regular installment payments over five years from the Effective Date or payment as otherwise agreed. | No | $0 | 100% |
| 1 | Priority Claims | Unimpaired.  The holder of an Allowed Priority Claim shall have all legal, equitable, and contractual rights to which such Allowed Claim entitles the holder.  Holders of Claims in this Class who do not file a Claim in the Bankruptcy Court shall retain all legal, equitable, and contractual rights to which such Claim entitles the holder subject to the Debtor's right to contest such Claim. | No | $0 | 100% |
| 2 | Secured Claims | Unimpaired.  The holder of an Allowed Secured Claim shall have all legal, equitable, and contractual rights to which such Allowed Claim entitles the holder.  Holders of Claims in this Class who do not file a Claim in the Bankruptcy Court shall retain all legal, equitable, and contractual rights to which such Claim entitles the holder subject to the Debtor's right to contest such Claim. | No | $0 | 100% |
| 3 | General Unsecured Claims (other than Asbestos PI Claims, Asbestos Property Damage Claims and Environmental Claims) | Unimpaired.  The holder of an Allowed General Unsecured Claim shall have all legal, equitable, and contractual rights to which such Allowed Claim entitles the holder.  Holders of Claims in this Class who do not file a Claim in the Bankruptcy Court shall retain all legal, equitable, and contractual rights to which such Claim entitles the holder subject to the Debtor's right to contest such Claim. | No | $75,000 | 100% |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claim(s) | Estimated Recovery |
|---|---|---|---|---|---|
| 4 | Asbestos PI Claims | Impaired. Asbestos PI Claims will be channeled to the Asbestos PI Trust, which will be funded pursuant to Article 9.2 of the Plan. Asbestos PI Claims will be resolved in accordance with the terms of the Asbestos PI Trust Documents. | Yes | Unknown | Unknown, but the Plan contemplates an initial distribution of 18% to holders of eligible Asbestos PI Claims |
| 5 | Asbestos Property Damage Claims | Unimpaired. The holder of an Allowed Asbestos Property Damage Claim shall have all legal, equitable, and contractual rights to which such Allowed Claim entitles the holder. Holders of Claims in this Class who do not file a Claim in the Bankruptcy Court shall retain all legal, equitable, and contractual rights to which such Claim entitles the holder subject to the Debtor's right to contest such Claim. | No | $0 | 100% |
| 6 | Environmental Claims | Unimpaired. The holder of an Allowed Environmental Claim shall have all legal, equitable, and contractual rights to which such Allowed Claim entitles the holder. Holders of Claims in this Class who do not file a Claim in the Bankruptcy Court shall retain all legal, equitable, and contractual rights to which such Claim entitles the holder subject to the Debtor's right to contest such Claim. | No | Environmental Claims associated with Kentile's properties or operations:  $0    Environmental Claims associated with Metex's properties or operations: Unknown | 100% |
| 7 | Equity Interests in Metex | Unimpaired | No | N/A | 100% |

## G.    Certain Conditions to Confirmation.

Pursuant to Article 12.1(a) of the Plan, it is a condition to confirmation of the Plan that at least seventy-five percent (75%) in number and two-thirds (2/3) in dollar amount of the holders of Asbestos PI Claims who actually vote on the Plan must vote to accept/in favor of the Plan. The conditions to confirmation also require that the Confirmation Order contain findings consistent with those required by section 524(g) of the Bankruptcy Code, which sets forth the statutory requirements for issuance of a "channeling injunction" of the type provided for under the Plan. For the Plan to be effective, the Confirmation Order must have been entered by the

Bankruptcy Court or the District Court.  If the Confirmation Order containing the Asbestos PI Channeling Injunction is issued by the Bankruptcy Court, such Confirmation Order must be affirmed by the District Court in order to be effective.  The Plan will not become effective unless and until such Confirmation Order becomes a Final Order.  Once the Plan becomes effective, the Settling Asbestos Insurance Entity Asbestos PI Trust Contributions and the Metex Asbestos PI Trust Contribution will be made to the Asbestos PI Trust, and the Asbestos PI Trust will begin to resolve, liquidate, and (if entitled to payment) pay Asbestos PI Claims in accordance with the terms of the Asbestos PI Trust Documents.

## H.    Voting on the Plan.

Not every claimant is entitled to vote on the Plan.  Under the Bankruptcy Code, only those classes of Claims or Equity Interests that are "impaired" and are entitled to receive a distribution of (or retain) property under a plan of reorganization are entitled to vote to accept or reject the plan.  Under the Plan, only Class 4 holders of Asbestos PI Claims are Impaired and are entitled to vote.

The Plan Proponents are seeking acceptance of the Plan by holders of Asbestos PI Claims in Class 4.  All Class 4 holders of Asbestos PI Claims who voted in the solicitation of the Prepackaged Plan should submit a new ballot for this Plan, as, among other things, this Plan is in certain respects materially different than the Prepackaged Plan and therefore requires a new solicitation and vote.

With respect to holders of Asbestos PI Claims in Class 4, the Bankruptcy Code provides that in connection with confirmation of a plan seeking an injunction under section 524(g), such as the Asbestos PI Channeling Injunction, such injunction may be issued only if: (a) the holders of the Asbestos PI Claims to be channeled under the injunction are classified separately under the plan; and (b) seventy-five percent (75%) in number of the holders of the Asbestos PI Claims in that class who actually vote on the plan vote in favor of the plan.  For a more complete description of the requirements for acceptance of the Plan, see Section XIII below.

Because Metex does not have readily accessible accurate records of the addresses of the overwhelming majority of individual holders of Asbestos PI Claims in Class 4, Metex has proposed special procedures for voting by counsel on behalf of holders of Asbestos PI Claims (if, as, and to the extent such counsel are authorized to do so) or else by the individual holders of Asbestos PI Claims.  Accordingly, this Disclosure Statement and a form of Ballot and Master Ballot are being sent to counsel of record for holders of Asbestos PI Claims.  Please review the voting procedures accompanying the Ballot or Master Ballot, as applicable, for detailed instructions regarding how to vote with respect to Asbestos PI Claims.  If you did not receive a Ballot, it is because Metex believes that you are (i) not entitled to vote on the Plan or (ii) an individual holder of an Asbestos PI Claim who is represented by counsel to whom a Master Ballot has been sent.

If you have any questions about the type of Ballot you received, please contact Metex's balloting and solicitation agent, Logan & Company, Inc. (the "Balloting Agent"), at 546 Valley Road, Upper Montclair, New Jersey 07043, (973) 509-3190.  Copies of the Plan and

this Disclosure Statement are available upon request to the Balloting Agent, at the following address:

| Balloting Agent: |
| --- |
| **Logan & Company, Inc.**<br>**546 Valley Road**<br>**Upper Montclair, New Jersey 07043**<br>**(973) 509-3190** |

> The *last day* to vote to accept or reject the Plan is May 2, 2014 (the "Voting Deadline").
>
> To be counted your ballot must be *actually received* by the Balloting Agent by such date.

Only actual votes cast by the Voting Deadline will be counted. Failure to return a Ballot will not be counted as either a vote for or against the Plan. Any improperly completed or late Ballot will not be counted. Any Ballot that indicates both an acceptance and rejection of the Plan will not be counted. If a creditor casts more than one Ballot voting the same Claim or interest before the Voting Deadline, the latest dated Ballot received before the Voting Deadline will be deemed to reflect the voter's intent and thus to supersede any prior Ballots.

Once an order confirming the Plan is issued by the Bankruptcy Court and affirmed by the District Court, or issued by the District Court, the Plan will bind all holders of Claims against and Equity Interests in Metex, whether or not they are entitled to vote or did vote on the Plan and whether or not they receive (or retain) any distributions or property under the Plan. Thus, you are encouraged to read this Disclosure Statement carefully. In particular, holders of Asbestos PI Claims who are entitled to vote on the Plan are encouraged to read this Disclosure Statement, the Plan and the exhibits and schedules to the Plan and to the Disclosure Statement and the form of Ballot included herewith carefully and in their entirety before voting to accept or to reject the Plan.

## I.    Disclosure Statement Enclosures.

Accompanying this Disclosure Statement are copies of: (i) the Plan (Disclosure Statement Exhibit 1 together with all exhibits thereto including the Insurance Settlement Agreements); (ii) Metex's Financial Statements (Disclosure Statement Exhibit 2); (iii) Metex's Financial Projections (Disclosure Statement Exhibit 3); and (iv) Metex's Liquidation Analysis (Disclosure Statement Exhibit 4).

In addition, a Ballot or Master Ballot for accepting or rejecting the Plan is enclosed with this Disclosure Statement if you (or your clients, if you are counsel to asbestos-related personal injury or wrongful death claimants) are entitled to vote to accept or reject the Plan.

J.      **Disclaimers.**

This Disclosure Statement contains summaries of certain provisions of the Plan, certain statutory provisions, certain documents related to the Plan, certain anticipated events in the case and certain financial information. Although Metex believes that the Disclosure Statement, and related document summaries, are fair and accurate, they are qualified to the extent they do not set forth the entire text of the Plan, such documents or any statutory provisions. The terms of the Plan govern in the event of any inconsistency with this Disclosure Statement. All exhibits to the Disclosure Statement are incorporated into and are a part of this Disclosure Statement as if set forth in full herein. The statements contained in this Disclosure Statement are made as of the date hereof, unless otherwise specified, and Metex disclaims any obligation to update any such statements after the hearing on approval of the Disclosure Statement.

All forward-looking statements contained herein or otherwise made by Metex involve material risks and uncertainties and are subject to change based on numerous factors, including factors that are beyond Metex's control. Accordingly, Metex's future performance and financial results may differ materially from those expressed or implied in any such forward-looking statements. Such factors include, but are not limited to, those described in this Disclosure Statement. Metex does not intend to update or revise its forward-looking statements even if experience or future changes make it clear that any projected results expressed or implied therein will not be realized.

The financial information contained herein has not been audited by a certified public accountant and has not necessarily been prepared in accordance with Generally Accepted Accounting Principles.

For purposes of this Disclosure Statement, the following rules of interpretation shall apply: (i) whenever the words "include," "includes" or "including" are used they shall be deemed to be followed by the words "without limitation," (ii) the words "hereof," "herein," "hereby" and "hereunder" and words of similar import shall refer to this Disclosure Statement as a whole and not to any particular provision, (iii) section and exhibit references are to this Disclosure Statement unless otherwise specified, and (iv) with respect to any distribution under the Plan, "on" a date means on or as soon as reasonably practicable thereafter.

In connection with Metex's solicitation of acceptances of the Plan pursuant to section 1126(b) of the Bankruptcy Code, Metex is furnishing a solicitation package, consisting of the Disclosure Statement, the enclosures hereto, and a Ballot or Master Ballot, as applicable, to each record holder of Claims eligible to vote or its counsel. This Disclosure Statement is to be used by each such eligible holder solely in connection with its evaluation of the Plan; use of this Disclosure Statement for any other purpose is not authorized. This Disclosure Statement may not be reproduced or provided to anyone other than advisors to the recipient without the prior written consent of Metex.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Rule 3016(c) of the Federal Rules of Bankruptcy Procedure, and not necessarily in accordance with federal or state securities laws or other

**non-bankruptcy law.  This Disclosure Statement was prepared with the intent to provide "adequate information" (as defined in the Bankruptcy Code) to enable holders of Claims against and Equity Interests in Metex to make informed judgments about the Plan.**

# TABLE OF CONTENTS

SUMMARY OF THE PLAN OF REORGANIZATION AND THE ASBESTOS PI
TRUST DISTRIBUTION PROCEDURES ................................................................... ii

A.    Introduction. ......................................................................................................... ii

B.    The Channeling Injunction and the Insurance Policy Injunction. ...................... iii

C.    Contributions to Asbestos PI Trust. ................................................................... iii

D.    How Asbestos Claimants Receive Distributions from the Asbestos PI Trust. ................. iv

      1.    The Asbestos PI Trust Distribution Procedures. ..................................... iv
      2.    Maximum Annual Payment. ..................................................................... vi
      3.    Application of the Payment Percentage. ................................................... vi
      4.    Proposed Trustee of the Asbestos PI Trust. ............................................ vii

E.    Reorganized Metex's Business. ......................................................................... vii

F.    Summary of Classification and Treatment under the Plan. ............................... vii

G.    Certain Conditions to Confirmation. ................................................................... ix

H.    Voting on the Plan. ............................................................................................... x

I.    Disclosure Statement Enclosures. ....................................................................... xi

J.    Disclaimers. ........................................................................................................ xii

I. Introduction ............................................................................................................... 1

II. Description of Kentile's History, Claims, and Insurance ........................................ 1

      A.    Kentile's Corporate History. ........................................................................ 1
            1.    Kentile Floors, Inc.'s Origins. ................................................................. 1
            2.    Kentile's 1992 Chapter 11 Case. ............................................................. 2
            3.    Events After Kentile's 1998 Plan. ........................................................... 3
      B.    Current Asbestos Personal Injury Claims Against Kentile. .......................... 3
      C.    Kentile's Insurance Coverage and Insurance Litigation. .............................. 4
            1.    Insurance Coverage. ................................................................................. 4
            2.    Insurance Coverage Litigation. ................................................................ 5

III. The Development of the Prepackaged Plan .......................................................... 6

      A.    Circumstances Leading to the Prepackaged Plan. ........................................ 6
      B.    Metex's Prepetition Discussions with the Prepetition Asbestos Claimants
            Committee, the Prepetition Future Claimants' Representative, and the
            Kentile Insurers. ........................................................................................... 7
      C.    The Inability to Consummate the Prepackaged Plan. ................................... 8

IV. The Development of the Current Plan ................................................................... 9

      A.    Chapter 11 Filing. ......................................................................................... 9
      B.    Appointment of the Asbestos Claimants Committee, the Future Claimants'
            Representative, and their Respective Professionals. ................................... 10
      C.    The Plan Settlements. .................................................................................. 12

      1.      The Insurance Settlement Agreements. ....................................................12

      2.      The Additional Liberty Mutual Payments and Settlement of the Asserted Claims. ........................................................................................14

      3.      Metex's Contribution to the Asbestos PI Trust...........................................15

      4.      Plan Attributes. ..........................................................................................15

V. Solicitation .......................................................................................................................16

    A.      Solicitation of Holders of Asbestos PI Claims ......................................................16

    B.      Notice to Holders of Secured Claims, General Unsecured Claims, Asbestos Property Damage Claims, Environmental Claims and Equity Interests. ..............................................................................................................18

VI. Events During the Chapter 11 Case ..............................................................................18

    A.      Appointments. ......................................................................................................18

    B.      Motions. ...............................................................................................................19

    C.      Approval of the Disclosure Statement and Solicitation Process, Approval of the Insurance Settlement Agreements, and Scheduling of Confirmation Hearing. ...............................................................................................................19

VII. Treatment of Holders of Claims and Equity Interests under the Plan....................19

    A.      Summary of Classification and Treatment. ...........................................................19

    B.      Description of Unclassified Claims. ......................................................................20

      1.      Administrative Expenses. ...........................................................................20

      2.      Administrative Fees and Expenses of Professionals...................................20

      3.      Priority Tax Claims.....................................................................................21

    C.      Description of Classified Claims and Equity Interests. .........................................22

      1.      Class 1 – Priority Claims. ...........................................................................22

      2.      Class 2 – Secured Claims. ...........................................................................23

      3.      Class 3 – General Unsecured Claims...........................................................23

      4.      Class 4 – Asbestos PI Claims. .....................................................................24

      5.      Class 5 – Asbestos Property Damage Claims. .............................................25

      6.      Class 6 – Environmental Claims..................................................................26

      7.      Class 7 – Equity Interests.............................................................................27

VIII. The Asbestos PI Trust and Contributions .................................................................28

    A.      The Asbestos PI Trust ...........................................................................................28

      1.      Creation of the Asbestos PI Trust. ..............................................................28

      2.      Appointment of Asbestos PI Trustee. .........................................................28

      3.      Appointment of Future Claimants' Representative. .....................................29

      4.      Appointment of Asbestos PI Trust Advisory Committee Members..........29

      5.      Contributions to the Asbestos PI Trust. ......................................................29

      6.      Transfer of Claims and Demands to the Asbestos PI Trust......................29

      7.      Treatment of Liabilities to Holders of Asbestos PI Claims.......................29

      8.      Indemnification by the Asbestos PI Trust....................................................29

      9.      Books and Records. .....................................................................................29

      10.      Estimation of Asbestos PI Claims................................................................30

B.    Description of the Consideration to be Contributed to the Asbestos PI
Trust. ........................................................................................................30
1.    The Settling Asbestos Insurance Entities Contribution to the
Asbestos PI Trust ..........................................................................30
2.    The Metex Contribution to the Asbestos PI Trust. .......................32

IX. Other Aspects of the Plan ...............................................................................33
A.    Distributions Other Than on Account of Asbestos PI Claims. ...............33
1.    Distributions. ................................................................................33
2.    Timing and Conditions of Distributions. .....................................33
3.    Delivery of Distributions. ............................................................33
4.    Procedures for Treating Disputed Claims under the Plan.............34
B.    Treatment of Executory Contracts and Unexpired Leases. ....................34
1.    Contracts and Leases Not Expressly Rejected Are Assumed........34
2.    Cure of Defaults. ..........................................................................35
3.    Rejection Damages Claims. ..........................................................35
C.    Effect of Confirmation. ...........................................................................36
1.    Revesting of Metex's Assets. .......................................................36
2.    Preservation of Certain Causes of Action; Defenses. ..................36
3.    Institution and Maintenance of Legal and Other Proceedings......37
4.    Insurance Neutrality. ....................................................................37
5.    Terms of Injunction and Automatic Stay......................................37
6.    No Liability for Certain Released Claims......................................38
7.    Dissolution of Committee; Creation of the Asbestos PI Trust
Advisory Committee; Continuation of Future Claimants'
Representative. ..............................................................................38
8.    Closing of Kentile's 1992 Chapter 11 Case..................................38
D.    Releases, Injunctions and Discharges. ....................................................38
1.    Discharge of Metex.......................................................................38
2.    Discharge Injunction. ...................................................................39
3.    Exculpation. ..................................................................................39
4.    Release of Metex's Officers and Directors. .................................40
5.    Asbestos PI Channeling Injunction..............................................40
6.    Limitations of the Asbestos PI Channeling Injunction. ...............40
7.    Insurance Policy Injunction. ........................................................41
8.    Preexisting Injunctions and Discharges. ......................................41
E.    Release of Avoidance Actions. ................................................................41
F.    Miscellaneous Provisions.........................................................................41

X. Metex's Business, Financial Information & Projections ...............................42
A.    Description of Metex's Current Business. ..............................................42
B.    Projections................................................................................................42
C.    Liquidation Valuation Analysis. ..............................................................43

XI. Governance of Reorganized Metex .................................................................43
A.    Management of Reorganized Metex..........................................................43
B.    Corporate Governance. .............................................................................43

XII. Certain Factors to Be Considered.........................................................................43

    A.     Certain Bankruptcy Considerations. ...................................................43
    B.     Risk Factors. ......................................................................................44
          1.     Overall Risks to Recovery by Holders of Claims.....................44
          2.     Certain Bankruptcy Considerations. ........................................44
          3.     Projected Financial Information. ..............................................44
          4.     Appointment of Asbestos PI Trustee and/or Members of the
               Asbestos PI Trust Advisory Committee for the Asbestos PI Trust. ..........45
          5.     Distributions under the Asbestos PI Trust Distribution Procedures. .........45
          6.     Post-Consummation Metex......................................................46
          7.     The Asbestos PI Channeling Injunction. ..................................46

XIII. Voting Procedures...............................................................................................46

    A.     Vote Required for Acceptance by a Class. ...........................................47
    B.     Class 4 Temporary Allowance For Voting Purposes.............................48
    C.     Classes Deemed to Accept. ..................................................................48
    D.     Voting Deadline. .................................................................................48

XIV. Confirmation of the Plan....................................................................................49

    A.     Confirmation Hearing. .........................................................................49
    B.     General Requirements of Section 1129. ...............................................49
    C.     Best Interests Test. ..............................................................................50
    D.     Feasibility...........................................................................................51

XV. Certain Federal Income Tax Consequences of the Plan........................................51

    A.     Consequences to Metex. ......................................................................52
    B.     Treatment of Metex's Contribution to the Asbestos PI Trust and Taxation
          of the Asbestos PI Trust......................................................................52
    C.     Consequences to Holders of Asbestos PI Claims .................................53
    D.     Information Reporting and Withholding. ...............................................54

XVI. Conclusion ........................................................................................................54

## EXHIBITS TO DISCLOSURE STATEMENT

EXHIBIT 1       PLAN OF REORGANIZATION AND EXHIBITS THERETO
EXHIBIT 2       METEX'S FINANCIAL STATEMENTS
EXHIBIT 3       METEX'S FINANCIAL PROJECTIONS
EXHIBIT 4       METEX'S LIQUIDATION ANALYSIS

# I.

## Introduction

Metex Mfg. Corporation ("Metex" or the "Debtor"), which was formerly known as Kentile Floors, Inc. ("Kentile"), commenced this Chapter 11 Case on November 9, 2012. Pursuant to this Disclosure Statement, the Plan Proponents are soliciting votes from holders of Asbestos PI Claims for the acceptance of the Plan.

This Disclosure Statement sets forth certain information regarding the history of Kentile, Metex's current operations and financial condition, the reorganization, and the anticipated post-reorganization operations of Reorganized Metex. This Disclosure Statement describes the terms and provisions of the Plan, specifically the creation of an Asbestos PI Trust, to which, pursuant to section 524(g) of the Bankruptcy Code, all asbestos-related personal injury and wrongful death Claims will be channeled, and an injunction established for the benefit of Metex and certain other parties, including various insurers, who will contribute to the Asbestos PI Trust in exchange for protection under the Asbestos PI Channeling Injunction. The Disclosure Statement also describes certain alternatives to the Plan, the effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan and from the Asbestos PI Trust. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims eligible to vote must follow for their votes to be counted.

Although the Plan Proponents believe that the descriptions and summaries contained in this Disclosure Statement are fair and accurate in all material respects, they are qualified in their entirety to the extent that they do not set forth the entire text of the documents and statutory provisions discussed. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by Metex's management after a review of the basis for such information.

*For a description of the Plan and its provisions, please see Sections VII, VIII, and IX hereof. For a discussion of certain factors to be considered prior to voting, please see Section XII hereof.*

# II.

## Description of Kentile's History, Claims, and Insurance

### A.    Kentile's Corporate History.

1.    *Kentile Floors, Inc.'s Origins.*

Kentile commenced business in the late 1800s as a manufacturer of cork tile, and thereafter progressed to making composite tile for commercial and residential use. Kentile at one time had manufacturing facilities in Torrance, California; Chicago, Illinois; Brooklyn, New York; and South Plainfield, New Jersey. The strength of Kentile's business was the manufacture of tile for commercial and institutional use. Kentile's business began facing financial difficulties

in the late 1970s. In the 1970s Kentile closed its California facility, and in the 1980s it closed its Brooklyn facility.

Until the mid-1980s Kentile used asbestos as one of the components in certain types of tile that it manufactured. Kentile experienced severe difficulties in maintaining its production of quality tile once it could no longer use asbestos.

In the 1970s and 1980s, in addition to its production of less decorative tile, which was often used for commercial and institutional purposes, Kentile began producing more decorative tile, essentially designed for residential use. Kentile encountered certain problems in competing with the residential tile designs offered by some of its competitors which resulted in a significant decline in its business and operations.

2.    *Kentile's 1992 Chapter 11 Case.*

Commencing in the 1970s Kentile was named a defendant, along with many others, in thousands of lawsuits in which the plaintiffs alleged health damages because of exposure to asbestos. A few of these lawsuits were settled by Kentile's insurance carriers for nuisance value, but most of these lawsuits were still pending in November, 1992, when Kentile filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Southern District of New York (Case No. 92 B 46466 (BRL)) (as defined in the Plan "Kentile's 1992 Chapter 11 Case"). At the time of Kentile's 1992 Chapter 11 Case, Kentile had outstanding against it approximately 20,000 claims seeking damages for personal injury or wrongful death related to exposure to Kentile's floor tiles.

During Kentile's 1992 Chapter 11 Case, Kentile attempted to sell its operations as a going concern to some of its competitors. That effort was unsuccessful, and in 1993 Kentile sold substantially all of its assets to a subsidiary of United Capital Corp. ("UCC"). UCC's subsidiary was unable to successfully operate the acquired assets and by 1995 made an assignment of those assets for the benefit of its creditors.

On December 15, 1998, Kentile confirmed a plan of reorganization ("Kentile's 1998 Plan") in its 1992 Chapter 11 Case. As part of Kentile's 1998 Plan, all the then outstanding common stock of Kentile was cancelled, and new stock was issued to UCC in exchange for its financial contributions that enabled the consummation of the 1998 Plan. Under Kentile's 1998 Plan, Kentile's name was changed to "KF Real Estate Holdings Corporation" ("KF"). Promptly thereafter UCC caused a company it controlled known as Metex Corporation to be merged into KF. Upon the merger, KF's name was changed to Metex Mfg. Corporation, which is the Debtor in this Chapter 11 Case and is the entity soliciting votes on the Plan.

Although Kentile's 1998 Plan was confirmed, Kentile's 1992 Chapter 11 Case remains open and has been dormant except for matters initiated by either Metex or the Kentile Insurers from time to time. Metex's Plan provides that on the Effective Date it will cause all open adversary proceedings commenced in Kentile's 1992 Chapter 11 Case to be dismissed and the case closed.

- 2-

3.    *Events After Kentile's 1998 Plan.*

In 1998, immediately after confirmation of Kentile's 1998 Plan, UCC caused one of its affiliates, Metex Corporation, which was in the business of producing metal textile products for the auto industry and transformers for the electric power industry, to be merged into Kentile.  At the time of the merger Kentile's sole assets consisted of an industrial property in South Plainfield, New Jersey, which had been closed in 1994, and its remaining product liability insurance.  Kentile (then known as KF Realty Corporation) was the survivor of the merger and its name was changed to Metex Mfg. Corporation.  In 2004, Metex sold Kentile's South Plainfield, New Jersey, facility.  In 2008, through a series of transactions, the operating assets of the former Metex Corporation, which had been merged into Kentile ten years earlier, were transferred out of the merged entity into two newly created operating subsidiaries of UCC -- Metal Textiles Corporation and AFP Transformer Corporation.  These two entities are currently leasing space in two separate industrial buildings in Edison, New Jersey which are owned by Metex.  The leases expire in 2033 (but may be terminated earlier upon notice by the tenant), are triple net leases, and generate a current combined annual rental to Metex of approximately $750,000.  Both properties are subject to ongoing environmental remediation which consumes a portion of these revenues.

One hundred percent of the outstanding common stock of Metex currently is held by Metex Holdings Corp. ("MHC"), a subsidiary of UCC.

**B.    Current Asbestos Personal Injury Claims Against Kentile.**

Kentile's 1998 Plan provided that holders of prepetition and postpetition asbestos claims against Kentile were entitled to pursue their claims solely to the extent of Kentile's insurance for such claims.[4]  After confirmation of Kentile's 1998 Plan, a significant number of asbestos personal injury claims were filed in the tort system naming Kentile as a defendant.  In accordance with Kentile's 1998 Plan these actions were defended and indemnity was paid by the Kentile Insurers.  From 2000 through 2012, according to the Kentile Insurers, approximately 10,000 Kentile asbestos claims were resolved through settlement or dismissal at a cost of

---

[4]       The "Kentile Insurers" who provided coverage for Asbestos PI Claims include:  Liberty Mutual Insurance Company; Fireman's Fund Insurance Company; National Fire Insurance Company of Hartford, as successor by merger to Transcontinental Insurance Company, and Continental Insurance Company, as successor in interest to certain policies issued by Harbor Insurance Company; American Home Assurance Company, Granite State Insurance Company and National Union Fire Insurance Company of Pittsburgh, PA; Hartford Accident and Indemnity Company; Century Indemnity Company (as successor to CCI Insurance Company, as successor to Insurance Company of North America), ACE Property & Casualty Company (f/k/a CIGNA Property and Casualty Company f/k/a Aetna Insurance Company), and Westchester Fire Insurance Company; Travelers Casualty and Surety Company, f/k/a The Aetna Casualty and Surety Company; and Allianz Global Risks US Insurance Company. Kentile also had coverage from Federal Insurance Company whose policies have been exhausted, but who paid approximately $62,000 to the NYLB Escrow in exchange for Metex's agreement to provide it the benefit of the Asbestos PI Channeling Injunction.  In addition, Kentile had coverage under policies issued by The Home Insurance Company, Integrity Insurance Company, and Midland Insurance Company, all of which are in insolvency proceedings.  Since the Chapter 11 filing, a settlement was reached by the Debtor regarding its claims under policies issued by The Home Insurance Company.   No payments ever were made by or on behalf of either Integrity Insurance Company or Midland Insurance Company.

approximately $154 million.  Based upon information provided by the Kentile Insurers approximately 6,000 active Asbestos PI Claims and over 20,000 inactive Asbestos PI Claims were outstanding as of the Commencement Date, the largest portion of which are filed in New York with cases in Illinois being the second largest group.

The Plan that is being solicited hereby affects holders of asbestos personal injury and wrongful death claims (as defined in the Plan, "Asbestos PI Claims").  Accordingly, the rights of holders of other Claims, including Secured Claims, General Unsecured Claims (other than Asbestos PI Claims), Asbestos Property Damage Claims, and Environmental Claims, are unimpaired by the Plan.  Holders of Secured Claims, General Unsecured Claims (other than Asbestos PI Claims), Asbestos Property Damage Claims and Environmental Claims will retain rights to assert their Claims, subject to all defenses of Metex to such Claims.  Holders of such Claims are directed to the relevant sections of this Disclosure Statement and to the Plan for further information regarding such Claims.

## C.    Kentile's Insurance Coverage and Insurance Litigation.

1.    *Insurance Coverage.*

As is common for similar industrial companies, Kentile purchased comprehensive primary, umbrella and excess general liability insurance policies.  Those policies are "occurrence-based" policies, which, subject to other policy terms, generally insure against "occurrences" that cause bodily injury or property damage during the applicable policy period, even if the injury or damage does not manifest itself until after the policy period.  "Occurrence" policies often provide insurance protection against asbestos and other "long-tail" claims, which are commonly asserted years or decades after the underlying injuries are alleged to have begun to occur.  Metex estimates that, as of the Commencement Date, Kentile had approximately $280 million of remaining, unexhausted products liability/completed operations coverage issued by the eight solvent, unexhausted Kentile Insurers.

Beginning in 1985, the comprehensive general liability insurance policies covering Kentile contain express asbestos exclusions that exclude all coverage for asbestos-related claims.

The Kentile Insurers advised Metex that between 2002 and 2012 they paid approximately $154 million for indemnity of Kentile asbestos personal injury claims.  The largest share of such payments (and substantially all defense costs since 2009) has been paid by Liberty Mutual Insurance Company ("Liberty Mutual"), a Kentile primary insurer, which initially received an adverse decision from the New York State Supreme Court in *National Fire Insurance Company of Hartford, et al., v. Travelers Casualty and Surety Company, et al.*, Index No. 105522/2008 (the "Coverage Action") (described in Section C.2. below).  The decision against Liberty Mutual was vacated in July 2009.  Nevertheless, Liberty Mutual continued to authorize settlements in accordance with its customary practice and an interim order which it had appealed.  Should the Plan not be approved and Kentile and the Kentile Insurers return to the Coverage Action, Liberty Mutual has reserved its rights to pursue cross-claims for contribution against Metex and the other Kentile Insurers.  If Liberty Mutual were successful in establishing

those cross-claims it would substantially reduce the insurance available to cover Asbestos PI Claims against Kentile.

2.    *Insurance Coverage Litigation.*

Beginning in the early 2000s, after confirmation of Kentile's 1998 Plan, the Kentile Insurers began to assert various defenses to payment of Kentile asbestos-related claims. Kentile's primary carriers asserted that their policies were exhausted, an assertion Metex disputed. Similarly, Kentile's upper level insurers asserted various other positions which, if valid, would substantially reduce Kentile's remaining available insurance. These disputes also included questions concerning the proper allocation of defense costs and indemnity, as well as the available limits of coverage. Despite discussions, the parties were unable to resolve these disputes, and in 2008 the Coverage Action was initiated.

The legal issues in the Coverage Action are quite extensive, including questions regarding what policies are triggered by any given claim, exhaustion and attachment points of the various policies, and importantly, allocation of shares of the costs among various parties. A number of the Kentile Insurers have asserted that their policies cannot attach until all coverage below them has been exhausted. They also assert that to the extent that their policies attach above a carrier which is insolvent they have no obligation to respond to claims. A similar argument has been made by various carriers to the effect that, to the extent insolvent carriers are responsible for continuous exposure during the years they were on the risk, they do not need to respond until Metex pays the share of such insolvent carrier. Carriers have also argued that allocation of asbestos liability continues so long as manifestation of asbestos disease is possible and therefore Metex is responsible to pay the share of such liability allocated to periods after January 1, 1985, when comprehensive general liability coverage was no longer available without exclusions for asbestos-related liability.

In 2010, Justice Ramos, the judge presiding over the Coverage Action, ruled that each Kentile Insurer is responsible only for the portion of injury-in-fact occurring during its policy period(s), thereby potentially exposing Metex to Kentile's asbestos-related liabilities in early years of alleged exposure to asbestos when there is no provable Kentile insurance, post 1985 when the asbestos risk was excluded from Kentile's insurance policies, and in any other years when a Kentile Insurer who was on the risk was insolvent. To the extent further decisions are rendered in favor of the Kentile Insurers and against Metex on the allocation issue, Metex will not have the resources to fund that portion of a settlement or judgment allocated to it. In part because of this fact, and in part because of Metex's desire to resolve all existing and future Asbestos PI Claims in a fair manner, Metex determined to settle its remaining insurance, and to prosecute a prepackaged chapter 11 case pursuant to Bankruptcy Code section 524(g) under which the proceeds of those insurance settlements would fund a trust established to resolve Kentile's existing and future asbestos claims.

Metex and the Kentile Insurers agreed to stay the Coverage Action to enable Metex to solicit votes on the Prepackaged Plan. That voluntary stay has been superseded by the automatic stay pursuant to Bankruptcy Code section 362 that went into effect on the Commencement Date of the instant Chapter 11 Case.

If the Plan which is the subject of this Disclosure Statement is confirmed and becomes effective, the Settling Asbestos Insurance Entities, whose Insurance Settlement Agreements are attached as Exhibits C-1 to C-10 to the Plan,[5] will contribute between $182.1 and $189.75 million (less sums expended for administrative expenses of this Chapter 11 Case, if any) to the Asbestos PI Trust and the Coverage Action will be dismissed.  For more information concerning the Insurance Settlement Agreements, *see* Section IV.C. below.

## III.

### The Development of the Prepackaged Plan

**A.      Circumstances Leading to the Prepackaged Plan.**

The cost of defending and resolving Asbestos PI Claims asserted against Kentile since 1998 has been substantial.  Over the past several years, there has been a material increase in the number of active claims against Kentile scheduled for trial, particularly mesothelioma claims, requiring more costly trial preparation and carrying a significant litigation risk.  These factors, together with the cost and risk in the Coverage Action, placed significant pressure on Metex.  Accordingly, by mid-2010 Metex concluded that it was advisable to commence a case under chapter 11 of the Bankruptcy Code to preserve Kentile's remaining insurance assets and to confirm a plan of reorganization that would resolve existing and future Kentile asbestos-related personal injury and wrongful death claims in accordance with the requirements of section 524(g) of the Bankruptcy Code.  Section 524(g) provides for the creation by a debtor of a trust to "assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products . . . ." 11 U.S.C. § 524(g)(2)(B)(i)(I). Section 524(g) further provides for a "channeling" injunction that directs all present and future asbestos-related "demands" to the trust for liquidation and satisfaction of allowed amounts. 11 U.S.C. § 524(g)(1). This channeling injunction, however, is valid and enforceable against future asbestos claimants only if, "as part of the proceedings leading to issuance of such injunction, the court appoints a legal representative for the purpose of protecting the rights of persons that might subsequently assert [asbestos-related personal injury or wrongful death claims against the debtor]. . . ." 11 U.S.C. § 524(g)(4)(B)(i).

---

[5]      Exhibits C-1 to C-8 to the Plan contain the settlement agreements with the eight solvent Kentile Insurers. Exhibit C-9 contains a settlement agreement with the Insurance Commissioner of the State of New Hampshire, as Liquidator of The Home Insurance Company, and the Superintendent of Financial Services of the State of New York, as Ancillary Receiver of The Home Insurance Company, which was entered after the filing of this Chapter 11 Case.  Exhibit C-10 contains a settlement agreement with Federal Insurance Company which was entered in June, 2012.

B.    **Metex's Prepetition Discussions with the Prepetition Asbestos Claimants Committee, the Prepetition Future Claimants' Representative, and the Kentile Insurers.**

In 2010, it became clear that there would not be a global resolution of the Coverage Action.  At that time, Metex and Liberty Mutual, the Kentile Insurer that since 2009 has been paying the largest share of defense and indemnity for Kentile's asbestos personal injury claims, began discussions regarding the possibility of a Metex prepackaged chapter 11 plan which, unlike Kentile's 1992 Chapter 11 Case, would establish a trust pursuant to section 524(g) of the Bankruptcy Code to resolve both existing Kentile asbestos claims as well as future demands.  Once Metex concluded that Liberty Mutual might be willing to support a Metex prepackaged plan, Metex approached the remaining seven solvent Kentile Insurers to determine their interest in such a plan.  Most of those Kentile Insurers, without committing, indicated a willingness to consider such an approach.

Armed with the knowledge that the Kentile Insurers would at least consider a prepackaged plan, during 2010, Metex approached Weitz & Luxenberg, P.C., a law firm that, according to the reports provided by the Kentile Insurers, served as counsel to the largest number of the holders of the asbestos claims against Kentile to determine its interest in a prepackaged plan.  In connection with its consideration of a prepackaged plan, Weitz & Luxenberg engaged Gilbert LLP to analyze Metex's insurance profile.

Weitz & Luxenberg eventually advised Metex that the firm would be willing to consider participating in a prepackaged plan at which point Metex requested that Liberty Mutual join in the discussions with Weitz & Luxenberg.

After meeting over a number of months, in the summer of 2011, Metex, Liberty Mutual, and Weitz & Luxenberg reached a general understanding on an outline of a prepackaged plan for Metex.  In the fall of 2011, two other law firms with significant numbers of asbestos personal injury claims against Kentile, Cooney & Conway and The Simmons Law Firm, joined in those discussions.  Those three firms are hereafter referred to as the "Prepetition Asbestos Claimants Committee."  The Prepetition Asbestos Claimants Committee selected the law firm of Caplin & Drysdale, Chartered as its counsel, Gilbert LLP as its insurance counsel, and Legal Analysis Systems, Inc. as its asbestos claims consultant.

On November 30, 2011, Metex, Liberty Mutual, and the members of the Prepetition Asbestos Claimants Committee, on behalf of themselves and certain plaintiffs they represented, executed an agreement (the "Liberty Mutual Settlement Agreement") pursuant to which the parties agreed to work towards a prepackaged plan for Metex. The Liberty Mutual Settlement Agreement also contained Liberty Mutual's commitment to provide $50 million (less the cost of the prepackaged plan) to a section 524(g) trust to be established under the prepackaged plan.

In late 2011, around the time of the execution of the Liberty Mutual Settlement Agreement, Metex selected Lawrence Fitzpatrick to represent holders of future asbestos-related claims known as "Demands" (the "Prepetition Future Claimants' Representative").  The selection of Mr. Fitzpatrick was based on his reputation for integrity, knowledge in the field of

complex mass tort proceedings and extensive experience with asbestos-related personal injury litigation.

Prior to assuming the role of Prepetition Future Claimants' Representative, Mr. Fitzpatrick had no association or relationship with, or other connection to, Kentile, Metex or any Affiliate of either, and had never represented any plaintiff, defendant, or insurer in any asbestos-related litigation against Kentile. Mr. Fitzpatrick has served as the future claimants' representative in the Chapter 11 cases of Pittsburgh Corning Corporation, North American Refractories Company, Global Industrial Technologies, Inc., ACandS, Inc., and Durabla Manufacturing Company, and currently is serving as the future claimants' representative in the chapter 11 case of Rapid-American Corporation.

Mr. Fitzpatrick selected Young Conaway Stargatt & Taylor, LLP as his law firm. He also retained Analysis, Research & Planning Corporation to act as his expert for the purpose of evaluating the Asbestos PI Claims against Metex.

In connection with the Prepackaged Plan, Mr. Fitzpatrick and his professionals (collectively, the "Prepetition Future Claimants' Representative Professionals"), as well as the professionals representing the Prepetition Asbestos Claimants Committee, conducted due diligence concerning the background, nature, and scope of Kentile's liability for Asbestos PI Claims. This investigation covered, among other things: the nature and extent of past and pending asbestos litigation against Kentile, including the types of claims asserted and the legal issues raised; the projected value of present and future Asbestos PI Claims; and the extent to which Kentile's insurance and other assets might be available to satisfy these liabilities in whole or in part.

In addition, in connection with the development of the Prepackaged Plan, Mr. Fitzpatrick and the Prepetition Future Claimants' Representative Professionals had discussions and negotiations with the Prepetition Asbestos Claimants Committee and its professionals regarding various issues, including in particular the creation of the Asbestos PI Trust Agreement and formulation of the Asbestos PI Trust Distribution Procedures.

After the Prepetition Asbestos Claimants Committee and the Prepetition Future Claimants' Representative were in place, Metex returned to individual negotiations with the seven remaining solvent Kentile Insurers with unexhausted coverage in order to negotiate settlements with those insurers. During the late spring and early summer of 2012, Metex reached settlements with those seven Kentile Insurers. Counsel to the Prepetition Asbestos Claimants Committee and counsel to the Prepetition Future Claimants' Representative participated in the drafting of the seven Insurance Settlement Agreements, although Metex's counsel was solely responsible for the negotiation of the settlement amounts.

Those seven settlement agreements, together with the Liberty Mutual Settlement Agreement, became the foundation for the Prepackaged Plan.

## C.    The Inability to Consummate the Prepackaged Plan.

The Prepackaged Plan contemplated that approximately $165 million, less the cost of negotiating, preparing and soliciting the Prepackaged Plan ($3 million), would be

contributed by the Settling Asbestos Insurance Entities to a section 524(g) trust to be formed under the Prepackaged Plan. Those funds, together with a $250,000 10-year promissory note to be issued by Metex to the trust were to be used to pay Asbestos PI Claims.

On June 29, 2012, Metex began solicitation of votes on the Prepackaged Plan with the support of the Prepetition Asbestos Claimants Committee and the Prepetition Future Claimants' Representative. A voting deadline of August 28, 2012 was established. As noted above, for a plan to be confirmed containing a channeling injunction preventing current and future asbestos claims from being asserted against the reorganized debtor or third parties, the plan must be approved by 75% of asbestos claimants voting on the plan and by 66 2/3% of the dollar value of claims voting on the plan. By the voting deadline 84% of claimants voting accepted the Prepackaged Plan but only 66.15% of the dollar value of claims voting were cast in favor of the Prepackaged Plan. Accordingly, the Prepackaged Plan could not be confirmed.

## IV.

## The Development of the Current Plan

### A.      Chapter 11 Filing.

Notwithstanding its inability to secure the necessary votes to confirm the Prepackaged Plan, Metex remained convinced that the agreements with the Settling Asbestos Insurance Entities provided the best option to provide fair and equitable treatment to Kentile's current and future asbestos claimants. Consequently, on November 9, 2012, after further negotiation with Liberty Mutual which resulted in changes to the Liberty Mutual Settlement Agreement and Mutual Releases which are described below and set forth in Exhibit C-1 to the Plan, Metex filed the instant Chapter 11 Case to preserve the Insurance Settlement Agreements and avoid a potential loss in the Coverage Action.

Prior to the filing of the instant Chapter 11 Case, on October 24, 2012, the following documents amending and supplementing the Settlement Agreement and Mutual Releases, Dated November 30, 2011 were executed by Liberty Mutual which encouraged and enabled Metex's filing of this Chapter 11 Case.

1.      October 24, 2012 Agreement Terminating Obligations and Rights. This Agreement, executed by Metex and the three members of the Prepetition Asbestos Claimants Committee, released the three law firms, their clients, and their counsel, from all obligations under the Settlement Agreement and Mutual Releases, Dated November 30, 2011 which had formed the basis for the Prepackaged Plan.

2.      Amendment to Settlement Agreement and Mutual Releases, Dated November 30, 2011 as of November 6, 2012. This Amendment, among other things, redefined "Plan" in the Liberty Mutual Settlement Agreement to include any plan of reorganization which contained the same material terms and conditions as the Prepackaged Plan.

- 9-

3.      Letter, dated October 24, 2012, from Counsel for Liberty Mutual to Metex and UCC.  Under this Letter, Liberty Mutual agreed, subject to certain limitations and conditions, to provide funding for this Chapter 11 Case (after use of all funds in the NYLB Escrow). Such funding, if provided, would reduce dollar for dollar the second installment ($25 million) payable by Liberty Mutual to the Asbestos PI Trust within 36 months of the Effective Date.  For a description of the NYLB Escrow, see Section IV.C.1 below.

4.      Supplement, dated October 24, 2012, to Settlement Agreement and Mutual Releases, Dated November 30, 2011.  In this document Liberty Mutual agreed to contribute up to $10 million to the Asbestos PI Trust within 30 days of the Effective Date for the benefit of Metex and/or UCC to resolve any liability of Metex or UCC regarding (i) the transfers in or about 2008 by Metex of certain operating assets to affiliates of UCC (see Section II.A.3. above), or (ii) the adequacy of Metex's and UCC's contribution to the Asbestos PI Trust in exchange for the benefit of the Asbestos PI Channeling Injunction (collectively, the "Asserted Claims").

5.      Letter Agreement, dated October 24, 2012, from Liberty Mutual to UCC.  In this Letter, Liberty Mutual agreed to reimburse up to $2 million of UCC's legal fees incurred in connection with and during this Chapter 11 Case.

As more fully described in Section IV.C.2. below (The Plan Settlements), Liberty Mutual, Metex and UCC have executed a Second Supplement, dated December 20, 2013, to the Settlement Agreement and Mutual Releases, dated November 30, 2011, effective as of the Effective Date of the Plan, under which the $10 million referenced in item 4 above and $1,750,000 of the $2 million referenced in item 5 will be paid by Liberty Mutual on behalf of UCC and Metex to the Asbestos PI Trust within 30 days of the Effective Date.

In respect of item 3 above, Metex believes that there are funds available in the NYLB Escrow to satisfy all costs of this Chapter 11 Case.  If funds are not available in the NYLB Escrow, Metex will use funds in the Administrative Fund to pay such costs and expenses of this Chapter 11 Case.  If such use of the Administrative Fund occurs, thereby reducing Liberty Mutual Insurance Company's Asbestos PI Trust Contribution, on the Effective Date Metex will release from the NYLB Escrow to the Asbestos PI Trust an amount equal to any reduction of Liberty Mutual Insurance Company's Asbestos PI Trust Contribution caused by such use of the Administrative Fund.

**B.      Appointment of the Asbestos Claimants Committee, the Future Claimants' Representative, and their Respective Professionals.**

In connection with this Chapter 11 Case, the U.S. Trustee appointed a committee of five individual asbestos plaintiffs asserting claims against Kentile.  Those five plaintiffs are represented by five law firms with significant personal injury practices:  Belluck & Fox; Weitz &

- 10-

Luxenberg, P.C.; Early Lucarelli Sweeney & Strauss; Cooney & Conway; and Gori Julian & Associates, PC. Two of those firms, Weitz & Luxenberg and Cooney & Conway, were members of the Prepetition Asbestos Claimants Committee.

        The Asbestos Claimants Committee engaged Caplin & Drysdale, Chartered, as its bankruptcy counsel, Gilbert LLP as its special insurance counsel, Legal Analysis Systems, Inc. as its consultant, and Charter Oak Financial Consultants, LLC, as its financial advisor. Caplin & Drysdale, Chartered, Gilbert LLP, and Legal Analysis Systems, Inc. previously had been engaged by the Prepetition Asbestos Creditors Committee which, as noted above, was released from all obligations under the Liberty Mutual Settlement Agreement prior to the filing of this Chapter 11 Case.

        On January 16, 2013, the Bankruptcy Court appointed Lawrence Fitzpatrick as the Future Claimants' Representative. Mr. Fitzpatrick had been the Prepetition Future Claimants' Representative in connection with the Prepackaged Plan. Mr. Fitzpatrick engaged Young Conaway Stargatt & Taylor, LLP as his counsel, and Analysis Research & Planning Corporation as his econometrician. Both firms had served in the same capacity in connection with the Prepackaged Plan. Upon the filing of this Chapter 11 Case, Mr. Fitzpatrick and the professionals who had represented him in connection with the Prepackaged Plan were released from any obligations asserted in connection with Mr. Fitzpatrick's representation as the Prepetition Future Claimants' Representative.

        The fees and expenses incurred in connection with the Prepackaged Plan by the Prepetition Asbestos Claimants Committee and the Prepetition Future Claimants' Representative and their professionals are set forth in the chart below.

| **Prepetition Professional** | **Representation** | **Fees and Expenses in Connection with the Prepackaged Plan** |
|---|---|---|
| Caplin & Drysdale, Chartered | Counsel to the Prepetition Asbestos Claimants Committee | $479,173.78 |
| Gilbert LLP | Insurance Counsel to the Prepetition Asbestos Claimants Committee | $133,435.13 |
| Legal Analysis Systems, Inc. | Claims Consultant to the Prepetition Asbestos Claimants Committee | $45,822.50 |
| Prepetition Future Claimants' Representative | Holders of Demands | $19,000.00 |

- 11-

| Young Conaway Stargatt & Taylor, LLP | Counsel to the Prepetition Future Claimants' Representative | $234,866.90 |
| Analysis Research & Planning Corporation | Claims Consultant to the Prepetition Future Claimants' Representative | $131,512.90 |

## C.    The Plan Settlements.

The Plan embodies a number of settlements that are described below.

1.    *The Insurance Settlement Agreements.*

As described in Section III above, in connection with negotiation of the Prepackaged Plan, Metex reached settlement agreements with the eight solvent Kentile Insurers to resolve issues over the disputed insurance coverage, copies of which are attached to the Plan as Exhibits C-1 to C-8.

In addition, shortly before the filing of this Chapter 11 Case, Metex reached an agreement with Federal Insurance Company ("Federal") whose coverage had earlier been exhausted.  As a result of that settlement, Federal contributed approximately $62,000 to the NYLB Escrow in respect of Federal's contribution claim against The Home Insurance Company. In exchange for this payment, Federal is deemed to be a Settling Asbestos Insurance Entity and will receive the benefit of the Asbestos PI Channeling Injunction and the Insurance Policy Injunction to be issued under the Plan.  A copy of the Insurance Settlement Agreement with Federal is attached to the Plan as Exhibit C-10.

After the commencement of this Chapter 11 Case, Metex reached an agreement with the Insurance Commissioner of the State of New Hampshire, as Liquidator of The Home Insurance Company ("The Home"), and the Superintendent of Financial Services of the State of New York, as the Ancillary Receiver of The Home, to pay the remaining limits of Kentile's policies issued by The Home to the Asbestos PI Trust on the Effective Date in exchange for being treated as Settling Asbestos Insurance Entities and Asbestos Protected Parties under the Plan.  Under that settlement, the payment to the Asbestos PI Trust of the remaining limits of policies issued by The Home (approximately $10 million) is subject to possible reduction as a result of a contribution claim asserted by Century Indemnity Company for $5.4 million which is currently being litigated in the New Hampshire liquidation proceeding of The Home. Accordingly, on the Effective Date, an additional $4.6 million to $10 million will be contributed to the Asbestos PI Trust on behalf of The Home above and beyond what was contemplated by the Prepackaged Plan.  A copy of the Insurance Settlement Agreement on behalf of The Home is attached to the Plan as Exhibit C-9.

Since the filing of this Chapter 11 Case, Metex's settlement agreement with Liberty Mutual has been amended to provide for additional payments of $11.75 million to the Asbestos PI Trust.

- 12-

The Plan is conditioned upon the Bankruptcy Court approving the nine Insurance Settlement Agreements, including those entered with the eight solvent Kentile Insurers plus the postpetition agreement entered on behalf of The Home. Metex anticipates accomplishing approval of the Insurance Settlement Agreements as part of the Confirmation Hearing. The nine Insurance Settlement Agreements contemplate that the Kentile Insurers will pay approximately $182.1 to $189.75 million (less sums used to pay administrative expenses of this Chapter 11 Case, if any) to the Asbestos PI Trust with approximately $88.2 million of that sum to be paid to the Asbestos PI Trust on or about the Effective Date.

The nine Kentile Insurers conditioned the payment of their settlement amount to the Asbestos PI Trust on, among other things, the receipt of the benefit of the Asbestos PI Channeling Injunction and the Insurance Policy Injunction provided under the Plan. Hartford Accident and Indemnity Company conditioned its settlement payment ($15 million) solely on approval by the Bankruptcy Court of a sale and purchase of policies pursuant to section 363 of the Bankruptcy Code free and clear of all claims and interests, although it will also receive the benefit of the Asbestos PI Channeling Injunction if the Plan is confirmed. Century Indemnity Company conditioned its settlement payment ($12 million) on receipt of the benefit of the Asbestos PI Channeling Injunction and the Asbestos Policy Injunction but reserved the right to have its settlement become effective on the receipt of a bankruptcy court order approving a sale and repurchase of its policies free and clear of all claims and interests pursuant to section 363 of the Bankruptcy Code rather than requiring that it be a beneficiary of the Asbestos PI Channeling Injunction. If Metex receives the proceeds from Hartford or Century prior to the Effective Date of the Plan, it will place such proceeds into an escrow account, and will request the Bankruptcy Court to approve this account as a "qualified settlement fund" under Section 468B of the Internal Revenue Code. Metex would then transfer the proceeds of that escrow account to the Asbestos PI Trust on the Effective Date of the Plan. See Plan Exhibits C-5 and C-6, for the Hartford and Century Insurance Settlement Agreements.

Seven of the Kentile Insurers included an entity called Crest Flooring, Inc. ("Crest") as an insured under their policies issued to Kentile. Metex understands that Crest was an Illinois corporation that at one time was a subsidiary of Kentile. In 1990, Crest merged with and into Herregan Distributors, Inc. ("Herregan"), a Minnesota corporation. The Insurance Settlement Agreements with those insurers (as well as the Insurance Settlement Agreements with the two others) contemplate that the policy buybacks will be free and clear of all claims and interests in the policy including any interest of Crest or Herregan.

In connection with the Prepackaged Plan, several of the Settling Asbestos Insurance Entities assigned their rights to their contribution claims against The Home arising out of payment by those Entities of The Home's share of previous Kentile settlements. The proceeds of these assignments, approximately $5.8 million (including $408,000 assigned by Liberty Mutual during this Chapter 11 Case), were deposited into an escrow account at Wilmington Trust, National Association (the "NYLB Escrow" which name will be changed to the "Metex Security Escrow" on the Effective Date of the Plan). The NYLB Escrow provides that it can be used to pay taxes, if any, on the earnings in such Account, administrative expenses in connection with the Chapter 11 Case, and to provide indemnity for Metex in the event it is determined to be liable for an Asbestos Property Damage Claim and/or an Environmental Claim (other than Environmental Claims associated with Metex's Edison, New Jersey real properties) for which

- 13-

there is no insurance. The NYLB Escrow Agreement, a copy of which is attached as Exhibit F to the Plan, provides that any proceeds remaining in the NYLB Escrow ten years after the Effective Date of the Plan will be transferred to the Asbestos PI Trust. Funds in the NYLB Escrow currently are being used to help fund the instant Chapter 11 Case. Metex estimates that the NYLB Escrow will contain approximately $2.5 to $3 million at or about the Effective Date of the Plan, excluding $750,000 of which Metex will transfer to the Asbestos PI Trust on the Effective Date.

2.      *The Additional Liberty Mutual Payments and Settlement of the Asserted Claims.*

        Shortly after the filing of this Chapter 11 Case, the Asbestos Claimants Committee and the Future Claimants' Representative issued a set of informal document requests directed to the Debtor for information concerning its financial condition and that of its ultimate parent, UCC, and for information pertaining to potential Asserted Claims (as defined below). Metex responded to these requests in the winter and spring of 2013. After reviewing Metex's responses, the Asbestos Claimants Committee and the Future Claimants' Representative sought approval from the Bankruptcy Court (to which Metex did not object) to take formal discovery of Metex. After receiving Bankruptcy Court permission, the Asbestos Claimants Committee and Future Claimants' Representative propounded upon Metex extensive document requests and later a series of written interrogatories. Those inquiries, among other things, concerned transfers of assets by Metex including the transfer in 2008 of its operating divisions to affiliates of UCC described in Section II.A.3. above. The discovery request also sought information concerning Kentile's asbestos claims history and information concerning Kentile's 1992 Chapter 11 Case and Kentile's 1998 Plan. In addition, the Asbestos Claimants Committee and the Future Claimants' Representative caused the issuance of a document subpoena to an accounting firm known as Marcum, which had served as a valuation consultant in connection with the 2008 transfer of the operating divisions. Marcum produced documents in response to the subpoena.

        The investigation and discovery described above generated additional discussions and negotiations by and among Metex, the Asbestos Claimants Committee, and the Future Claimants' Representative, Liberty Mutual, and UCC. Those negotiations led to an increase in payments under the Liberty Mutual Insurance Settlement Agreement from the $50 million (less the $3 million cost of the Prepackaged Plan) to which it had committed under its Insurance Settlement Agreement, to $61.75 million (less the $3 million cost of the Prepackaged Plan). The additional $11.75 million will be paid by Liberty Mutual within 30 days of the Effective Date on behalf of Metex, UCC, and the other Metex Related Parties to resolve any and all asserted claims arising out of (a) direct and indirect transactions in or about 2008 by which certain operating assets were transferred out of Metex to two newly formed corporations that are wholly-owned subsidiaries of UCC and the proceeds thereof were subsequently transferred by Metex to UCC (see Section II.A.3. above), and (b) the adequacy of Metex's and UCC's contribution to the Asbestos PI Trust for the purpose of their obtaining the benefits of the Asbestos PI Channeling Injunction (referred to as the "Asserted Claims"). The Asserted Claims are released in the Plan.

        For its part, in connection with the postpetition resolution of the Asserted Claims, UCC agreed to limit its reimbursement of its legal fees and costs to $250,000 thus making the additional $1,750,000 available for payment by Liberty Mutual to the Asbestos PI Trust. In addition to payments of the $11.75 million to be made to the Asbestos PI Trust by Liberty

- 14-

Mutual on behalf of Metex, UCC, and the other Metex Related Parties, UCC released its claim that, as Metex's shareholder, it was entitled to coverage for Asbestos PI Claims under Asbestos Insurance Policies. UCC's release of these rights provided, in Metex's view, support for the approval of the Insurance Settlement Agreements and, ultimately, the Plan.

A copy of the Second Supplement, dated December 20, 2013, reflecting these $10 million and $1,750,000 payments is attached to the Liberty Mutual Settlement Agreement Dated November 30, 2011 (Exhibit C-1(g) to the Plan).

Accordingly, as a result of extensive negotiations during the Chapter 11 Case among the Asbestos Creditors Committee, the Future Claimants' Representative, Metex, UCC, and Liberty Mutual, the Asserted Claims were resolved as set forth above.

3.    *Metex's Contribution to the Asbestos PI Trust.*

The Plan (as did the Prepackaged Plan) provides that Metex will issue to the Asbestos PI Trust a 10-year, $250,000 note in the form of Exhibit D to the Plan (as defined in the Plan the "Metex Promissory Note"). The Metex Promissory Note will be secured by a pledge of fifty-one (51%) percent of Metex's common stock. A form of the Pledge Agreement is attached as Exhibit E to the Plan. In addition to the Metex Promissory Note, as part of the postpetition negotiations of the Plan, Metex agreed to turn over to the Asbestos PI Trust on the Effective Date $750,000 from the NYLB Escrow that would, but for the turnover, have been available to Metex to satisfy Asbestos Property Damage Claims and Kentile-related Environmental Claims for a period of ten years from the Effective Date.

4.    *Plan Attributes.*

The essential principle of the Plan is that all Asbestos PI Claims will be channeled to the Asbestos PI Trust and that holders of existing Asbestos PI Claims and future Demands will have recourse solely to the Asbestos PI Trust to resolve such claims. Metex, and certain Metex Related Parties set forth on Exhibit G to the Plan will become Asbestos Protected Parties entitled to the benefit of the Asbestos PI Channeling Injunction.

In addition, the Settling Asbestos Insurance Protected Parties, and each of the directors, officers and shareholders of such Entities in their capacity as such, will be protected by the Asbestos PI Channeling Injunction that will prevent the commencement or continuation of an Asbestos PI Claim or Demand against them. The Plan also contemplates the issuance of an Insurance Policy Injunction, pursuant to which the Settling Asbestos Insurance Protected Parties will receive the benefit of an injunction against any Claim based on, arising from, or attributable to, in any way, an Asbestos Insurance Policy or Other Insurance Policy to the extent rights thereunder were released under an Insurance Settlement Agreement.

As part of this chapter 11 process, Metex intends to seek a finding of fact and/or conclusion of law in the Confirmation Order to be issued by the Bankruptcy Court and affirmed by the District Court or issued by the District Court, that Reorganized Metex and the Asbestos PI Trust to be established pursuant to the Plan, are valid legal Entities separate and distinct from one another and each of Reorganized Metex and the Asbestos PI Trust are not and may not in the future be held liable for any liability of the other Entity based upon any legal or equitable theory,

- 15-

including those consisting of or relating to veil piercing, alter ego, successor liability, fraudulent transfer, or conspiracy, including but not limited to fraudulent transfer or fraudulent conveyance claims under applicable state or federal law.

If the Plan does not become effective, no party in interest in the Chapter 11 Case shall be bound or prejudiced by any representation, written or oral, made by any party in connection with the Plan or the negotiation or prosecution of the Plan, including without limitation the representations made in the Plan, the Disclosure Statement or the Confirmation Order.

## V.

### Solicitation

**A.      Solicitation of Holders of Asbestos PI Claims.**

The Plan Proponents have commenced solicitation of votes on the Plan as of the date hereof by mailing (via first-class U.S. mail, postage prepaid) the solicitation packages as described below.  Metex is soliciting the votes of only holders of Asbestos PI Claims in Class 4, either directly or through their attorneys.  No other parties in interest are entitled to vote on the Plan, as all other parties in interest are Unimpaired.  The Balloting Agent will file vote certifications (the "Vote Certifications") certifying acceptances from the creditors entitled to vote and who actually vote.

A solicitation package (the "Attorney Solicitation Package") is being sent to counsel known by the Debtor (based on the Debtor's records and any list of attorneys furnished to the Debtor on or before the entry of the Solicitation Procedures Order) to represent or potentially to represent individuals who may hold or assert Asbestos PI Claims.

The Attorney Solicitation Package shall include:

(a)      the Disclosure Statement (to which the Plan is annexed as an exhibit), in electronic format on a CD-ROM;

(b)      the nine motions to approve the Insurance Settlement Agreements (to which the Insurance Settlement Agreements are attached as exhibits), in electronic format on a CD-ROM;

(c)      the Solicitation Procedures Order, in electronic format on a CD-ROM;

(d)      a master ballot (the "Master Ballot");

(e)      a preaddressed return envelope;

(f)      a letter from the Future Claimants' Representative and the Asbestos Claimants Committee recommending that claimants vote to accept/in favor of the Plan;

- 16-

       (g)     a copy of a notice of the solicitation; and

       (h)     a cover letter describing the contents of the solicitation package and the enclosed CD-ROM, and instructions for obtaining (free of charge) hard copies of the materials provided in electronic format.

In addition to the Attorney Solicitation Packages, solicitation packages will be sent directly to the holders of Class 4 Asbestos PI Claims who either contact Metex directly or whose counsel requests that such holders be sent a solicitation package (the "Individual Solicitation Package"). The Individual Solicitation Package shall include:

       (a)     the Disclosure Statement (to which the Plan is annexed as an exhibit), in electronic format on a CD-ROM;

       (b)     the nine motions to approve the Insurance Settlement Agreements (to which the Insurance Settlement Agreements are attached as exhibits), in electronic format on a CD-ROM;

       (c)     the Solicitation Procedures Order, in electronic format on a CD-ROM;

       (d)     an individual ballot for voting a Class 4 Claim, (the "Individual Ballot");

       (e)     a preaddressed return envelope;

       (f)     a letter from the Future Claimants' Representative and the Asbestos Claimants Committee recommending that claimants vote to accept/in favor of the Plan;

       (g)     a copy of the notice of the solicitation; and

       (h)     a cover letter describing the contents of the solicitation package and the enclosed CD-ROM, and instructions for obtaining (free of charge) hard copies of the materials provided in electronic format.

Attorneys who are unable to vote on behalf of a holder of an Asbestos PI Claim or wish to have the holder cast his or her own ballot on the Plan are requested to furnish the Balloting Agent with the name and address of each such holder within fifteen (15) calendar days of receipt of the Attorney Solicitation Package. If an attorney represents more than twenty (20) such holders, such names and addresses should be provided in electronic format in each case so that it is received within fifteen (15) calendar days of receipt of the Attorney Solicitation Package. An attorney making a request in accordance with this paragraph may include in the Solicitation Package a letter from their law firm recommending whether to accept or reject the Plan so long as such letter is provided to the Balloting Agent within fifteen (15) calendar days of receipt of the Attorney Solicitation Package.

A Solicitation Package is being sent to known or potential holders of Indirect Asbestos PI Claims which includes cross-claims, contribution claims, subrogation claims, indemnity claims, and other similar derivative claims.

In an additional effort to ensure that all individuals and counsel representing clients with Asbestos PI Claims are given the opportunity to request solicitation packages, Metex will publish a notice of the solicitation in the following publications: *Charleston Gazette and Daily Mail*, *The New York Times*, *New Orleans Times-Picayune*, *Chicago Tribune*, *San Francisco Chronicle*, *Philadelphia Inquirer*, and *USA Today*. Affidavits of such publication will be filed with the Court.

In a further effort to maximize notice and ensure that the solicitation process is as transparent as possible, Metex will make the Disclosure Statement available in electronic format on a special solicitation information website (*www.loganandco.com*) created by the Balloting Agent.

As clearly stated on the Ballots, in order to be counted, completed Ballots must be received by the Balloting Agent by 5:00 p.m., Eastern Time, on May 2, 2014 (the "Voting Deadline"). Accordingly, claimants and their counsel will have approximately 60 days from the mailing of the Disclosure Statement to vote.

The Plan Proponents believe that by virtue of its distribution of the Individual Solicitation Packages, the Attorney Solicitation Packages, and Solicitation Packages sent to holders of Indirect Asbestos PI Claims, substantially all holders of Asbestos PI Claims in Class 4 will have been solicited.

**B.      Notice to Holders of Secured Claims, General Unsecured Claims, Asbestos Property Damage Claims, Environmental Claims and Equity Interests.**

Holders of Secured Claims, General Unsecured Claims, Asbestos Property Damage Claims, Environmental Claims, and Equity Interests are not impaired by the Plan. Rights of holders of such Claims and Equity Interests will be reinstated under the Plan without prejudice to the rights of Reorganized Metex or any other party in interest to contest or otherwise defend against such Claim in an appropriate forum when and if such Claim is sought to be enforced. Accordingly, holders of such Claims and Equity Interests will not be entitled to vote on the Plan. The Debtor intends to give actual notice of the Plan to holders of such Claims and Interests as appropriate together with an opportunity to object to the Plan should those holders choose to do so.

## VI.

## Events During the Chapter 11 Case

**A.      Appointments.**

As noted above, in connection with this Chapter 11 Case, the U.S. Trustee appointed five members to the Asbestos Claimants Committee. The Asbestos Claimants Committee selected Caplin & Drysdale, Chartered as its general counsel, Gilbert LLP as its insurance counsel, Legal Analysis Systems, Inc. as its asbestos consultant, and Charter Oak Financial Consultants, LLC, as its financial advisor. The Bankruptcy Court appointed Lawrence Fitzpatrick as the Future Claimants' Representative. Mr. Fitzpatrick selected Young Conaway

- 18-

Stargatt & Taylor LLP as his counsel and Analysis Research & Planning Corporation as his asbestos consultant. These parties conducted due diligence of the affairs of the Debtor and were actively involved in the plan settlement described above. These parties also assumed responsibility for the negotiation and drafting of the Asbestos PI Trust Agreement (Exhibit A to the Plan) and the Asbestos PI Trust Distribution Procedures (Exhibit B to the Plan).

**B.    Motions.**

As is customary, on the filing of its Chapter 11 Case, Metex sought and the Bankruptcy Court approved, certain motions that smoothed its transition into Chapter 11 and eased the administrative burden of this Chapter 11 Case. The Bankruptcy Court has approved the following motions:

- Case Administration. These motions sought Bankruptcy Court authorization to: (i) approve notice procedures and authorize email service of pleadings; (ii) establish interim compensation procedures for Professionals; (iii) approve certain notice procedures in relation to personal injury claimants; and (iv) authorize the Bankruptcy Court to enter Orders if no objection is entered thereto.

- Business Operations. The Bankruptcy Court authorized Metex to maintain Metex's existing bank accounts, including its operating accounts, Administrative Account, and NYLB Escrow. Metex also received Bankruptcy Court approval to continue to invest sums in the NYLB in accordance with the policies outlined in the NYLB Escrow Agreement.

- The NYLB Escrow. The NYLB Escrow was approved as a Qualified Settlement Fund pursuant to Section 468B of the Internal Revenue Code.

**C.    Approval of the Disclosure Statement and Solicitation Process, Approval of the Insurance Settlement Agreements, and Scheduling of Confirmation Hearing.**

The Bankruptcy Court, at Metex's request, has approved this Disclosure Statement as containing adequate information to solicit votes on the Plan. It also has approved the form of notice of and established the dates for hearings on confirmation of the Plan and approval of the Insurance Settlement Agreements. See Section IV.C. for a general discussion of those agreements and Exhibits C-1 to C-10 to the Plan for copies thereof.

## VII.

## Treatment of Holders of Claims and Equity Interests under the Plan

**A.    Summary of Classification and Treatment.**

The table set forth in section F of the Summary of Plan of Reorganization and the Asbestos PI Trust Distribution Procedures at the beginning of this Disclosure Statement sets forth the classification and treatment under the Plan for the Claims against and Equity Interests in Metex, as well as the estimated recovery for each Class. The table also identifies which

- 19-

Classes are entitled to vote on the Plan based on the rules set forth in the Bankruptcy Code. Unless otherwise indicated, the characteristics and amount of the Claims or Equity Interests in the following Classes are based on the books and records of Metex, as of the date hereof.

**B.    Description of Unclassified Claims.**

1.    *Administrative Expenses.*

In order to confirm the Plan, Allowed Administrative Expense Claims must be paid in full on the Effective Date or in a manner otherwise agreeable to the holders of those Administrative Expense Claims.  Administrative expenses are the actual and necessary costs and expenses of Metex's Chapter 11 Case, including postpetition salaries and other benefits earned by employees, officers and directors, amounts owed to vendors providing goods and services during the Chapter 11 Case, any indebtedness or obligations incurred or assumed by Metex as Debtor-in-Possession during the Chapter 11 Case, and all other debts incurred by Metex after the Commencement Date in the ordinary course of its business.

Consistent with the requirements of the Bankruptcy Code, the Plan generally provides for Allowed Administrative Expense Claims to be paid in full by the later of (i) the Effective Date (or as soon thereafter as is reasonably practicable), and (ii) the first Business Day after the date that is thirty (30) days after the date such Administrative Expense Claim becomes Allowed, except with regard to Administrative Expense Claims incurred in the ordinary course of business, which may be paid by Metex in accordance with its past practice and the terms of the agreements governing such obligations.

Reorganized Metex, in its sole and absolute discretion, may settle Administrative Expense Claims in the ordinary course of business without further Bankruptcy Court approval. Metex or Reorganized Metex will have the right to object to any Administrative Expense Claim on the later of (i) 180 days after the Effective Date, subject to such extensions as may be granted from time to time by the Bankruptcy Court, and (ii) 30 days after the date such Administrative Expense Claim is filed.  Unless Metex or Reorganized Metex objects to an Administrative Expense Claim, the Administrative Expense Claim will be deemed allowed in the amount requested.  In the event that Metex or Reorganized Metex timely objects to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Expense Claim should be Allowed and, if so, in what amount.

Metex's business consists of the ownership and operation of two industrial buildings in Edison, New Jersey which are under triple net leases.  Metex has been paying its expenses associated with those buildings in the ordinary course and expects to do so through the Effective Date.  Accordingly, Metex does not anticipate any significant Administrative Expense Claims, except for those held by Professionals.

2.    *Administrative Fees and Expenses of Professionals.*

Administrative expenses also include the actual, reasonable, and necessary fees and expenses of the Professionals retained by Metex and certain other parties in the Chapter 11 Case.  The fees and expenses of Reed Smith LLP, Metex's counsel, Caplin & Drysdale,

Chartered and Gilbert LLP, counsel to the Asbestos Claimants Committee, the Future Claimants' Representative and the Future Claimants' Representative's Professionals have all been paid to date from the NYLB Escrow. The costs of Logan & Company, Inc. as Noticing and Balloting Agent, and the cost of printing and distributing these materials and solicitation of the votes on the Plan will all be paid from the NYLB Escrow which has been funded as part of the settlements with certain of the Settling Asbestos Insurance Entities described above.

In connection with an October 24, 2012 amendment to Metex's settlement with Liberty Mutual, Liberty Mutual agreed, to the extent funds are not otherwise available from the NYLB Escrow, to exercise its discretion to pay additional amounts to an Administrative Fund for the payment of fees, expenses, and costs of the administration of Metex's Chapter 11 Case (see Section IV.A.3. above), subject to certain limitations and conditions. Under the Liberty Mutual Settlement Agreement, such amounts paid by Liberty Mutual are to be offset against the final installment of $25 million payable due within 36 months of the Effective Date the amount of such funding. Metex believes that there are funds available in the NYLB Escrow to satisfy all costs of this Chapter 11 Case. If funds are not available in the NYLB Escrow, Metex will use funds in the Administrative Fund to pay such costs and expenses of this Chapter 11 Case. If such use of the Administrative Fund occurs, thereby reducing Liberty Mutual Insurance Company's Asbestos PI Trust Contribution, on the Effective Date Metex will release from the NYLB Escrow to the Asbestos PI Trust an amount equal to any reduction of Liberty Mutual Insurance Company's Asbestos PI Trust Contribution caused by such use of the Administrative Fund.

All Professionals seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330 or 503 of the Bankruptcy Code shall (i) file, on or before the deadline specified in the Confirmation Order, their respective applications for final allowance of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (A) upon the later of (1) the Effective Date and (2) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim of Professionals becomes an Allowed Administrative Expense Claim, or (B) upon such other terms as may be mutually agreed upon by such holder and Reorganized Metex. Such Administrative Expense Claims of Professionals shall be paid from the NYLB Escrow and/or the Administrative Fund as appropriate.

3.      *Priority Tax Claims.*

Priority Tax Claims are essentially the unsecured Claims of federal and state governmental authorities for the kinds of taxes specified in section 507(a)(8) of the Bankruptcy Code, such as certain income taxes, property taxes, excise taxes, and employment and withholding taxes. These unsecured Claims are given a statutory priority in right of payment. Metex has received a tax claim in the amount of approximately $575,000 from the Illinois Department of Revenue, which asserts a priority. The claim relates to the 1992-93 period. Metex intends to object to such claim on a number of bases, including that such claim was discharged in Kentile's 1992 Chapter 11 Case. Metex also has received a tax claim in the approximate amount of $7,000 from the City of New York, which asserts a priority. The claim relates to the period ending November 9, 2012, the date of Metex's filing. Metex has objected to

such claim on the basis, among others, that it has no obligation to the City of New York for general corporate taxes. Metex anticipates that there will be no Priority Tax Claims.

Except to the extent that the holder of an Allowed Priority Tax Claim has been paid by Metex prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, receive in full satisfaction, settlement and discharge of and in exchange for such Allowed Priority Tax Claim, either of the following, at the sole and absolute discretion of Reorganized Metex:  (a) Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim, on the latest of:  (i) the Effective Date; (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable; (iii) the date such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy law; or (b) regular installment payments in Cash (i) of a total value, as of the Effective Date, equal to the allowed amount of such Priority Tax Claim; and (ii) over a period ending not later than five (5) years after the Effective Date.

## C.    Description of Classified Claims and Equity Interests.

1.    *Class 1 – Priority Claims.*

Priority Claims (other than Priority Tax Claims) include Claims that are granted priority in payment under section 507(a) of the Bankruptcy Code, such as certain wage, salary and other compensation obligations to employees of Metex (up to a statutory cap of $10,950 per employee).

There has been no bar date established in this Chapter 11 Case for claims in this Class.  To the extent a Proof of Claim has been filed or a Claim has otherwise been brought in this Chapter 11 Case, Metex and Reorganized Metex have a period of one year from the Effective Date, or if such Proof of Claim is filed or such Claim is brought after the Effective Date but prior to the closing of this Chapter 11 Case, ninety (90) days after such Proof of Claim is filed or such Claim is brought, to object to such Claim.  To the extent that such Claim becomes an Allowed Claim in this Chapter 11 Case under the circumstances described in Article 1.5 of the Plan, the holder of such Claim will have all legal, equitable, and contractual rights to which such Allowed Claim entitles the holder.  To the extent a holder of a Claim in this Class does not file a Proof of Claim in this Chapter 11 Case, such Claim shall pass through the Plan and the holder of such Claim shall retain all legal, equitable, and contractual rights to which such Claim entitles such holder, subject to the rights of Metex or Reorganized Metex to contest or otherwise defend against such Claim when and if such Claim is sought to be enforced.

Because of the limited nature of its real estate operations, Metex does not believe that there will be any Priority Claims.

Class 1 is Unimpaired under the Plan. Each holder of a Priority Claim is deemed to have accepted the Plan and, accordingly, is not entitled to vote to accept or reject the Plan.

2. *Class 2 – Secured Claims.*

Class 2 consists of Secured Claims, which would include Claims arising under agreements and obligations of Metex to the extent of the value of any security given by Metex therefor, and obligations secured by statutory liens.

There has been no bar date established in this Chapter 11 Case for claims in this Class. To the extent a Proof of Claim has been filed or a Claim has otherwise been brought in this Chapter 11 Case, Metex and Reorganized Metex have a period of one year from the Effective Date, or if such Proof of Claim is filed or such Claim is brought after the Effective Date but prior to the closing of this Chapter 11 Case, ninety (90) days after such Proof of Claim is filed or such Claim is brought, to object to such Claim. To the extent that such Claim becomes an Allowed Claim in this Chapter 11 Case under the circumstances described in Article 1.5 of the Plan, the holder of such Claim will have all legal, equitable, and contractual rights to which such Allowed Claim entitles the holder. To the extent a holder of a Claim in this Class does not file a Proof of Claim in this Chapter 11 Case, such Claim shall pass through the Plan and the holder of such Claim shall retain all legal, equitable, and contractual rights to which such Claim entitles such holder, subject to the rights of Metex or Reorganized Metex to contest or otherwise defend against such Claim when and if such Claim is sought to be enforced.

Metex has not granted mortgages or liens on its Edison, New Jersey properties. Because of the limited nature of its operations, Metex does not believe there exist any Secured Claims.

Class 2 is Unimpaired under the Plan. Each holder of a Secured Claim is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

3. *Class 3 – General Unsecured Claims.*

Class 3 consists of general unsecured non-priority Claims, other than Asbestos PI Claims, Asbestos Property Damage Claims and Environmental Claims. This Class consists principally of the Claims of trade and other business creditors for goods and services provided to Metex prior to the Commencement Date, and damage Claims if any, arising from Metex's rejection (if any) of executory contracts and unexpired leases.

There has been no bar date established in this Chapter 11 Case for claims in this Class. To the extent a Proof of Claim has been filed or a Claim has otherwise been brought in this Chapter 11 Case, Metex and Reorganized Metex have a period of one year from the Effective Date, or if such Proof of Claim is filed or such Claim is brought after the Effective Date but prior to the closing of this Chapter 11 Case, ninety (90) days after such Proof of Claim is filed or such Claim is brought, to object to such Claim. To the extent that such Claim becomes an Allowed Claim in this Chapter 11 Case under the circumstances described in Article 1.5 of the Plan, the holder of such Claim will have all legal, equitable, and contractual rights to which such Allowed Claim entitles the holder. To the extent a holder of a Claim in this Class does not file a Proof of Claim in this Chapter 11 Case, such Claim shall pass through the Plan and the holder of such Claim shall retain all legal, equitable, and contractual rights to which such Claim

entitles such holder, subject to the rights of Metex or Reorganized Metex to contest or otherwise defend against such Claim when and if such Claim is sought to be enforced.

Because of the limited nature of its real estate operations, Metex estimates that on the Effective Date, the General Unsecured Claims will approximate $75,000.

Class 3 is Unimpaired under the Plan. Each holder of a General Unsecured Claim is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

4.      *Class 4 – Asbestos PI Claims.*

Asbestos PI Claims means each of the following: (i) a Metex Asbestos PI Claim; (ii) an Indirect Asbestos PI Claim; (iii) a Derivative Liability Asbestos PI Claim; (iv) a Direct Action Claim; and (v) a Demand. Asbestos PI Claims do not include Asbestos Property Damage Claims.

As of the Effective Date, liability for all Asbestos PI Claims shall automatically and without further act, deed or court order be channeled to and assumed by the Asbestos PI Trust in accordance with, and to the extent set forth in, Articles IX and XI of the Plan, the applicable Plan Documents and the Confirmation Order. The Asbestos PI Trust shall be funded in accordance with the provisions of Article 9.2 of the Plan. Each Asbestos PI Claim shall be resolved in accordance with the terms of the Asbestos PI Trust Documents. The sole recourse of the holder of an Asbestos PI Claim on account of such Asbestos PI Claim shall be to the Asbestos PI Trust, and no holder shall have any right whatsoever to assert its Asbestos PI Claim against any Asbestos Protected Party.

The Asbestos PI Trust Distribution Procedures set forth the following types of disease categories for Asbestos PI Claims and the values related thereto.

| Level | Disease Category | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|---|
| VIII | Mesothelioma | $135,000 | $175,000 | $330,000 |
| VII | Lung Cancer 1 | $65,000 | $78,000 | $100,000 |
| VI | Lung Cancer 2 | NONE | $15,000 | $25,000 |
| V | Other Cancers | $17,500 | $20,000 | $25,000 |
| IV | Severe Asbestosis | $65,000 | $78,000 | $100,000 |
| III | Asbestosis/Pleural Disease | $5,500 | NONE | NONE |
| II | Asbestosis/Pleural Disease | $2,500 | NONE | NONE |
| I | Other Asbestos Disease | $100 | NONE | NONE |

The initial payment percentage established for payment of Asbestos PI Claims has been established at 18%.

Class 4 is Impaired under the Plan. Each holder of an Asbestos PI Claim shall be entitled to vote to accept or reject the Plan to the extent and in the manner provided in Article V of the Plan and the Solicitation Procedures Order.

- 24-

5.    *Class 5 – Asbestos Property Damage Claims.*

Class 5 consists of Asbestos Property Damage Claims.  These Claims consist of damage to property caused by Kentile asbestos containing floor tiles.

"Asbestos Claims" was defined in Kentile's 1998 Plan to mean "any Claim against Kentile based upon damages caused by asbestos other than environmental damages." Thus the definition of "Asbestos Claim" included damage to property caused by Kentile's asbestos containing products.  The Bankruptcy Court in Kentile's 1992 Chapter 11 Case issued an order setting a bar date of January 17, 1997 by which all "Asbestos Claims" (as defined in Kentile's 1992 Chapter 11 Case) had to be filed or forever barred.  As a consequence of the bar date order and the notice thereof through direct notice and by publication, a significant number of claims alleging property damage resulting from Kentile's asbestos containing floor tile were filed against Kentile by January 17, 1997.  By 2006, settlements of those claims had been reached with Arkansas; California; Connecticut; Delaware; Idaho; Illinois; Kentucky; Louisiana; Mississippi; Missouri; New York; North Dakota; Pennsylvania; Rhode Island; Texas; West Virginia; Wyoming; the District of Columbia; Baltimore County, Maryland; the City of New York; the Port Authority of New York and New Jersey; Verizon New York, Inc.; New York City Transit Authority; Orleans Parish, Louisiana; City of Birmingham, Michigan; Comerica Bank; the National Bank of Detroit (n/k/a Chase); Consumers Energy Company (f/k/a Consumers Power Company); Ameritech Corporation; Park Shelton Apartments and The City of Port Huron, Michigan.  The last remaining known asbestos property damage claim asserted against Kentile in its 1992 Chapter 11 Case was settled with the City of Baltimore in February, 2012.

Kentile's 1998 Plan provided that all existing and any future Asbestos Property Damage Claims would be paid solely from Kentile's available insurance and enjoined claims against Kentile and Metex.  All injunctions issued pursuant to Kentile's 1998 Plan will remain in place and will not be affected by the Plan.

Because of the establishment of the bar date in Kentile's 1992 Chapter 11 Case and the nature of claims asserting damages to property, *i.e.*, that the damages relate to the cost of removal of asbestos, and because of the settlements described in the preceding paragraph, Metex believes there are no outstanding Asbestos Property Damage Claims.  To the extent any such Claims are asserted, assuming confirmation of the Plan and approval of the Insurance Settlement Agreements, Metex will have remaining insurance, which also is available to respond to Kentile-related Environmental Claims, of up to $3 million under its settlement with Liberty Mutual (in addition to sums remaining in the NYLB Escrow for a period of ten years after the Effective Date) to respond to Asbestos Property Damage Claims.  Because insurance was available to resolve Asbestos Property Damage Claims on a first come, first served basis under Kentile's 1998 Plan and because Kentile had the right to compromise or settle its insurance as contemplated by the 1998 Plan, Metex believes holders of Asbestos Property Damage Claims, if any, are not impaired by the Plan.

There has been no bar date established in this Chapter 11 Case for claims in this Class.  To the extent a Proof of Claim has been filed or a Claim has otherwise been brought in this Chapter 11 Case, Metex and Reorganized Metex have a period of one year from the Effective Date, or if such Proof of Claim is filed or such Claim is brought after the Effective

Date but prior to the closing of this Chapter 11 Case, ninety (90) days after such Proof of Claim is filed or such Claim is brought, to object to such Claim. To the extent that such Claim becomes an Allowed Claim in this Chapter 11 Case under the circumstances described in Article 1.5 of the Plan, the holder of such Claim will have all legal, equitable, and contractual rights to which such Allowed Claim entitles the holder. To the extent a holder of a Claim in this Class does not file a Proof of Claim in this Chapter 11 Case, such Claim shall pass through the Plan and the holder of such Claim shall retain all legal, equitable, and contractual rights to which such Claim entitles such holder, subject to the rights of Metex or Reorganized Metex to contest or otherwise defend against such Claim when and if such Claim is sought to be enforced.

Without limitation on the foregoing, nothing in the Plan is intended to modify, revive, reinstate, or otherwise grant a right on behalf of any Asbestos Property Damage Claims that were previously barred or otherwise discharged in connection with Kentile's 1992 Chapter 11 Case and/or Kentile's 1998 Plan.

Holders of Class 5 Asbestos Property Damage Claims are not Impaired by the Plan and thus not entitled to vote on the Plan and are deemed to have approved the Plan.

6.      *Class 6 – Environmental Claims.*

Class 6 consists of Environmental Claims. These Claims consist of any Claim by any person for damages to the environment.

Kentile at one time had manufacturing plants in Torrance, California; Chicago, Illinois; Brooklyn, New York; and South Plainfield, New Jersey. Kentile closed its California facility in the 1970s and in the 1980s ceased operations at its Brooklyn facility. Both the California plant and the Brooklyn plant were sold prior to the filing of Kentile's 1992 Chapter 11 Case. The Chicago plant was closed and sold in 1995 and the South Plainfield plant was sold in 2004.

The Bankruptcy Court in Kentile's 1992 Chapter 11 Case issued an order requiring that all "Claims" (as defined in Kentile's 1992 Chapter 11 Case) be filed or forever barred. Accordingly, to the best of Metex's knowledge all Environmental Claims relating to Kentile's former manufacturing facilities have been resolved. However, Metex received in 2009 an information questionnaire from the United States Environmental Protection Agency regarding Kentile's former Brooklyn operation which was located near the Gowanus Canal. The Gowanus Canal was designated a superfund site by the U.S. Environmental Protection Agency in 2010. Metex responded to the questionnaire indicating that it had no knowledge related to Kentile's former Brooklyn, New York facility.

Kentile's 1998 Plan provided that all existing and future Kentile "Environmental Claims" (as defined in Kentile's 1998 Plan) were channeled to insurance and enjoined claims against Kentile and Metex. All injunctions issued pursuant to Kentile's 1998 Plan will remain in place and will not be affected by the Plan.

Metex believes all Kentile related Environmental Claims either were time barred as a result of the January 17, 1997 bar date in Kentile's 1992 Chapter 11 Case, or, to the extent not time barred, limited by the 1998 Kentile Plan to the right to seek damages solely from

- 26-

remaining available insurance.  Assuming confirmation of the Plan and approval of the Insurance Settlement Agreements, Metex will have remaining insurance, which also is available to respond to Asbestos Property Damage Claims, of up to $3 million under its Insurance Settlement Agreement with Liberty Mutual (in addition to sums remaining in the NYLB Escrow for a period of ten years after the Effective Date) that may respond to Kentile-related Environmental Claims for property damage.  Because insurance was available on a "first come, first served" basis under Kentile's 1998 Plan and because Kentile had the right to compromise or settle its insurance as contemplated by the 1998 Plan, Kentile-related Environmental Claims, to the extent they exist, are not impaired as the holders of such Claims continue to have whatever rights they had under Kentile's 1998 Plan.

Metex is conducting ongoing environmental remediation at its two facilities in Edison, New Jersey.  Such remediation has been and will continue to be handled in the ordinary course of Metex's business.

There has been no bar date established in this Chapter 11 Case for claims in this Class.  To the extent a Proof of Claim has been filed or a Claim has otherwise been brought in this Chapter 11 Case, Metex and Reorganized Metex have a period of one year from the Effective Date, or if such Proof of Claim is filed or such Claim is brought after the Effective Date but prior to the closing of this Chapter 11 Case, ninety (90) days after such Proof of Claim is filed or such Claim is brought, to object to such Claim.  To the extent that such Claim becomes an Allowed Claim in this Chapter 11 Case under the circumstances described in Article 1.5 of the Plan, the holder of such Claim will have all legal, equitable, and contractual rights to which such Allowed Claim entitles the holder.  To the extent a holder of a Claim in this Class does not file a Proof of Claim in this Chapter 11 Case, such Claim shall pass through the Plan and the holder of such Claim shall retain all legal, equitable, and contractual rights to which such Claim entitles such holder, subject to the rights of Metex or Reorganized Metex to contest or otherwise defend against such Claim when and if such Claim is sought to be enforced.

Without limitation on the foregoing, nothing in the Plan is intended to modify, revive, reinstate, or otherwise grant a right on behalf of any Kentile-related Environmental Claims that were previously barred or otherwise discharged in connection with Kentile's 1992 Chapter 11 Case and/or Kentile's 1998 Plan.

Holders of Class 6 Environmental Claims are not Impaired by the Plan and thus not entitled to vote on the Plan and are deemed to have approved the Plan.

7.    *Class 7 – Equity Interests.*

Class 7 consists of the Equity Interests in Metex, all of which are held by MHC.

On the Effective Date, the holder of the Equity Interests in Metex shall retain those Interests pursuant to the Plan.

Class 7 is Unimpaired under the Plan, and MHC, as the holder of such Interests, shall be deemed to have accepted the Plan.

# VIII.

## The Asbestos PI Trust and Contributions

**A.      The Asbestos PI Trust**

1.      *Creation of the Asbestos PI Trust.*

        On the Effective Date, the Asbestos PI Trust shall be created in accordance with the Plan Documents, the Asbestos PI Trust Documents and section 524(g) of the Bankruptcy Code.  The Asbestos PI Trust is intended to constitute a "qualified settlement fund" within the meaning of section 468B of the Internal Revenue Code and the regulations issued thereunder. The purpose of the Asbestos PI Trust shall be to assume, liquidate, and resolve all Asbestos PI Claims (whether existing as of the Effective Date or arising at any time thereafter) and to use the Asbestos PI Trust Assets to pay holders of Asbestos PI Claims in accordance with the terms of the Asbestos PI Trust Agreement, the Asbestos PI Trust Distribution Procedures, the Plan and the Confirmation Order, and in such a way as to provide reasonable assurance that the Asbestos PI Trust will value, and be in a financial position to pay, present Asbestos PI Claims and future Demands in substantially the same manner, and to otherwise comply in all respects with the requirements of section 524(g)(2)(B) of the Bankruptcy Code.  The Asbestos PI Trust shall have no liability for any Claim other than an approved Asbestos PI Claim.  On the Effective Date, all right, title and interest in and to the Asbestos PI Trust Assets and any proceeds thereof will be transferred to and vested in the Asbestos PI Trust, free and clear of all Claims, Demands, Equity Interests, Encumbrances and other interests of any Entity without any further action of the Bankruptcy Court or any Entity.

        Upon dissolution of the Asbestos PI Trust, after the wind-up of its affairs by the Asbestos PI Trustee and payment of all the Asbestos PI Trust's liabilities has been provided for (including, without limitation, the Asbestos PI Trust Expenses), all Asbestos PI Trust Assets will be donated to such organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which shall be as selected by the Asbestos PI Trustee in his or her reasonable discretion; *provided, however,* that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on, or the relief of the suffering of, individuals with asbestos-related disorders and (ii) the tax-exempt organization(s) shall not bear any relationship to Reorganized Metex within the meaning of section 468B(d)(3) of the Internal Revenue Code.

2.      *Appointment of Asbestos PI Trustee.*

        Charles A. Koppelman has been chosen to serve as the Asbestos PI Trustee.  He currently serves as trustee of the ASARCO LLC Asbestos Personal Injury Settlement Trust, the United States Gypsum Asbestos Personal Injury Settlement Trust, the T. H. Agriculture & Nutrition, LLC Asbestos Personal Injury Trust, and the Quigley Company, Inc. Asbestos Personal Injury Trust.  It is anticipated that the Bankruptcy Court will approve the selection of Mr. Koppelman as the Asbestos PI Trustee in the Confirmation Order.  Additionally, it is anticipated that the Bankruptcy Court will approve the selection of Wilmington Trust Company as the Delaware trustee of the Asbestos PI Trust.

3.      *Appointment of Future Claimants' Representative.*

Lawrence Fitzpatrick shall serve as the Future Claimants' Representative in connection with the operation of the Asbestos PI Trust.  For information about Mr. Fitzpatrick see Sections III.B. and IV.B. above.

4.      *Appointment of Asbestos PI Trust Advisory Committee Members.*

The initial members of the Asbestos PI Trust Advisory Committee shall be those persons designated in the Confirmation Order or Plan Supplement.

5.      *Contributions to the Asbestos PI Trust.*

On the Effective Date, Metex and the Settling Asbestos Insurance Entities will make the Metex Asbestos PI Trust Contribution and Settling Asbestos Insurance Entity Asbestos PI Trust Contribution, respectively, to the Asbestos PI Trust, as described in Section VIII.B. below.

6.      *Transfer of Claims and Demands to the Asbestos PI Trust.*

On the Effective Date, all Asbestos PI Claims, including Demands, will be channeled to the Asbestos PI Trust and shall be satisfied solely by the assets held by the Asbestos PI Trust.  For more information about the Asbestos PI Channeling Injunction, see Sections IX.D.5 and IX.D.6 below.  The Asbestos PI Trust shall have no liability for any Claims other than Asbestos PI Claims and no Claims other than Asbestos PI Claims shall be transferred and channeled to the Asbestos PI Trust.

7.      *Treatment of Liabilities to Holders of Asbestos PI Claims.*

The transfer to, vesting in, and assumption by the Asbestos PI Trust of the Asbestos PI Trust Assets, on or after the Effective Date, as contemplated by the Plan, will, among other things, discharge Metex and Reorganized Metex from, and satisfy all obligations and liabilities of the other Asbestos Protected Parties for and in respect of, all present Asbestos PI Claims, with all Asbestos PI Claims (including Demands) being channeled to the Asbestos PI Trust.  The sole recourse of any holder of an Asbestos PI Claim, on account of such Asbestos PI Claim or part thereof, will be against the Asbestos PI Trust.

8.      *Indemnification by the Asbestos PI Trust.*

The Asbestos PI Trust shall, pursuant to the terms of the Asbestos PI Trust Agreement, indemnify and hold harmless the Asbestos Protected Parties for any liability or alleged liability, arising out of, or resulting from, or attributable to, an Asbestos PI Claim.

9.      *Books and Records.*

On the Effective Date, any Asbestos Records of Kentile or Metex shall be treated in accordance with the Asbestos Records Cooperation Agreement, which shall be substantially in the form as set forth in a Plan Supplement.

- 29-

10.    *Estimation of Asbestos PI Claims.*

        The Future Claimants' Representative engaged Analysis Research & Planning Corporation and the Asbestos Claimants Committee engaged Legal Analysis Systems, Inc. to estimate the aggregate value of Kentile's pending and future Asbestos PI Claims through 2050. The claims valuation experts have been provided with claims data and related information relevant to the estimation process, including a database of asbestos personal injury and wrongful death claims filed against and resolved by the Kentile Insurers.

        In order to estimate an aggregate value, the experts prepared forecasts that estimate the number, type, and year of filing of future asbestos-related personal injury and wrongful death claims against Kentile along with the estimated cost of resolving those claims. To create such forecasts, the experts applied methodologies that he or she had employed and tested in other asbestos-related bankruptcies and other contexts, and each made certain assumptions about historical events and likely future behavior. The results of the expert reports were made available to their respective clients which used the information to develop the Asbestos PI Trust Distribution Procedures and the Initial Payment Percentage.

**B.    Description of the Consideration to be Contributed to the Asbestos PI Trust.**

1.    *The Settling Asbestos Insurance Entities Contribution to the Asbestos PI Trust*

| Asbestos Insurance Entity | Amount | Payment Terms |
|---|---|---|
| Liberty Mutual Insurance Company | $58.75 million, including $11.75 million, which is being paid on behalf of Metex and UCC and the other Metex Related Parties in exchange for the settlement and release of the Asserted Claims and inclusion of UCC and the other Metex Related Parties as Asbestos Protected Parties. | $33.75 million within 30 days after the Effective Date.  $25 million, less sums, if any, provided to pay Administrative Expense Claims in this Chapter 11 Case, within the next 36 months after the Effective Date. |
| Fireman's Fund Insurance Company | $40 million | $10 million within 30 days of receiving notice that the Effective Date of the Plan has occurred; $5 million on the first anniversary of the Effective Date; $3 million on each of the next seven anniversaries of the Effective Date; and $4 million on the ninth anniversary of the Effective Date |

| | | |
|---|---|---|
| National Fire Insurance Company of Hartford, as successor by merger to Transcontinental Insurance Company, and Continental Insurance Company, as successor in interest to certain policies issued by Harbor Insurance Company | $.5 million | $.5 million within 60 days of the Effective Date |
| American Home Assurance Company, Granite State Insurance Company, and National Union Fire Insurance Company of Pittsburgh, PA | $25 million | $25 million in ten equal annual installments with the first payment on the later of the Effective Date or January 2, 2013 |
| Century Indemnity Company (as successor to CCI Insurance Company, as successor to Insurance Company of North America and ACE Property & Casualty Company (f/k/a CIGNA Property and Casualty Company f/k/a Aetna Insurance Company) | $12 million | $12 million payable in ten equal annual installments commencing within 30 days after the Effective Date of the Plan |
| Allianz Global Risks US Insurance Company f/k/a Allianz Insurance Company | $5.5 million | $5.5 million within 30 days of notice that the Effective Date of the Plan has occurred |
| Hartford Accident and Indemnity Company | $15 million | $15 million within 30 days of notice that the Order approving the Settlement Agreement has been entered and become final |
| Travelers Casualty and Surety Company (formerly known as The Aetna Casualty and Surety Company) | $20 million | $15 million within 30 days of the Effective Date of the Plan and $1,666,666 on each anniversary thereafter in equal installments for a total of $20 million |

| | | |
|---|---|---|
| To be paid by the NYLB on behalf of The Home Insurance Company | Approximately $4.6 to $10 million | $4 million within 30 days after written notice of the Effective Date, and the balance within 30 days of written notice of the occurrence of both (i) final determination of the allowed amount of the Century Indemnity Claim pursuant to a final, non-appealable court order and (ii) the first anniversary of the Effective Date |
| Funds Remaining in the NYLB Escrow after the Effective Date | Up to $3 million (estimated) | $750,000 will be paid on the Effective Date to the Asbestos PI Trust. The balance, after deduction of the $750,000, is assumed to be approximately $2.25 million, which will pour over to the Asbestos PI Trust on the tenth anniversary of the Effective Date |
| **TOTAL** | **$182.1 million to $189.75 million** | |

Copies of the settlement agreements pursuant to which each of the Settling Asbestos Insurance Entities will make contributions to the Asbestos PI Trust are set forth on Exhibit C to the Plan.

2.     *The Metex Contribution to the Asbestos PI Trust.*

Pursuant to the Plan, on the Effective Date, Metex will issue a ten (10) year, $250,000 promissory note to the Asbestos PI Trust. The note will bear interest at four percent (4%) per annum and will be secured by a pledge of fifty-one percent (51%) of the stock in Reorganized Metex. (A form of the Metex Promissory Note and Pledge Agreement are set forth on Exhibits D and E to the Plan, respectively.) Metex will also release on the Effective Date $750,000 from the NYLB Escrow Account to the Asbestos PI Trust. Further, as noted above, Liberty Mutual has agreed to pay $11,750,000 on behalf of Metex, UCC, and the other Metex Related Parties in settlement of the Asserted Claims.

The Plan further provides that Metex will assign to the Asbestos PI Trust its Asbestos Insurance Rights (as defined in the Plan) which include, subject to certain limitations, rights against Settling Asbestos Insurance Entities and any Non-Settling Asbestos Insurance Entities, if any. Metex also will assign to the Asbestos PI Trust the balance of the NYLB Escrow after ten years from the Effective Date subject to the prior payment of Administrative Expense Claims of Professionals and United States Trustee Fees, and payments for Asbestos Property Damage Claims and Kentile-related Environmental Claims.

- 32-

## IX.

## Other Aspects of the Plan

**A.    Distributions Other Than on Account of Asbestos PI Claims.**

One of the key concepts under the Bankruptcy Code is that only Claims that are "allowed" may receive distributions under a Chapter 11 plan.  This term is used throughout the Plan and the descriptions below.  In general, an "allowed" Claim simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the Claim, and the amount thereof, is in fact a valid obligation of the debtor.  For an explanation of how Disputed Claims will be determined, see section IX.A.4. below.

1.    *Distributions.*

Other than with respect to distributions to be made to Asbestos PI Claims by and from the Asbestos PI Trust, Reorganized Metex will make all Distributions required to be made under the Plan as provided under Article VI of the Plan.  All distributions to be made on account of Asbestos PI Claims will be made in accordance with the terms of the Asbestos PI Trust Documents, including the Asbestos PI Trust Distribution Procedures.

2.    *Timing and Conditions of Distributions.*

(a)    Date of Distributions.

Except as otherwise provided in the Plan, Plan Documents and the Confirmation Order, any Distributions to be made under the Plan on account of Allowed Claims (other than Asbestos PI Claims which will be paid by the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures) will be made on the Effective Date or as soon thereafter as is practicable.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, or as soon thereafter as is practicable, but will be deemed to have been completed as of the required date.

3.    *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, all Distributions to any holder of an Allowed Claim (other than an Asbestos PI Claim) will be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court, as may be required, or on the books and records of Metex or its agents, or in a letter of transmittal, unless Metex has been notified in writing of a change of address.

If any such holder's Distribution is returned as undeliverable, then no further Distributions to such holder will be made unless and until Reorganized Metex is notified of such holder's then-current address, at which time all missed Distributions shall be made to such holder (without interest).  A Distribution that is not claimed by the expiration of six (6) months from the date that such Distribution was made will be deemed unclaimed property under section 347(b) of the Bankruptcy Code and will revest in Reorganized Metex, and the claim of any

- 33-

holder to such Distributions will be discharged and forever barred. Metex or Reorganized Metex will not be required to attempt to locate any holder of an Allowed Claim.

4.    *Procedures for Treating Disputed Claims under the Plan.*

(a)    Disputed Claims.

A Disputed Claim is any Claim that is not an Allowed Claim (and has not already been disallowed by a Final Order of the Bankruptcy Court or withdrawn). Any Claim that is contingent, unliquidated, or disputed is a Disputed Claim. Any Claim as to which no objection or request for estimation has been filed, no litigation has commenced, and Metex otherwise has assented to the validity thereof (and as to which a proof of Claim has been properly and timely filed, to the extent required by the Plan or any order of the Bankruptcy Court), is an Allowed Claim. Any Claim as to which any objection or request for estimation that has been filed has been settled, waived, withdrawn or denied by a Final Order, is an Allowed Claim. Any Claim that is allowed (i) pursuant to the terms of a Final Order, (ii) pursuant to the terms of an agreement by and among the holder of such Claim and Metex (or Reorganized Metex, as the case may be) or (iii) under the terms of the Plan, is an Allowed Claim.

The term "Allowed" does not apply to Claims held by holders of Class 4 Asbestos PI Claims. All Asbestos PI Claims will be determined and paid by the Asbestos PI Trust in accordance with Article 9.2 of the Plan and the Asbestos PI Trust Documents, including the Asbestos PI Trust Distribution Procedures. After the Effective Date, all Asbestos PI Claims must be submitted solely to the Asbestos PI Trust for resolution, which shall be in accordance with the Asbestos PI Trust Distribution Procedures, and only the Asbestos PI Trust will have the right to object to and/or pay Asbestos PI Claims.

(b)    Objections to Claims.

Metex and Reorganized Metex will be entitled to file objections to Claims that have been or properly should have been brought in the Bankruptcy Court (other than Asbestos PI Claims), on or before the first (1st) anniversary of the Effective Date (unless such day is not a Business Day, in which case such deadline shall be the next Business Day thereafter), as the same may be extended from time to time by the Bankruptcy Court, and shall be authorized to settle, compromise, withdraw or litigate to judgment such objections without further approval of the Bankruptcy Court.

## B.    Treatment of Executory Contracts and Unexpired Leases.

1.    *Contracts and Leases Not Expressly Rejected Are Assumed.*

Subject to approval of the Bankruptcy Court, section 365 of the Bankruptcy Code allows a debtor to assume or reject its executory contracts and unexpired leases.

Metex shall assume, as of the Effective Date, all Executory Contracts to which Metex is a party, except for: (a) the Executory Contracts specifically listed in the Schedules to the Plan Supplement, which shall either be rejected or assumed and assigned, respectively, as described therein; and (b) the Executory Contracts specifically addressed in the Schedules to the

Plan Supplement or pursuant to a Final Order of the Bankruptcy Court entered on or before the Effective Date. Metex may, at any time on or before the Effective Date, amend the Schedules to the Plan Supplement to delete therefrom or add thereto any Executory Contract. Metex shall provide notice of any such amendment to the parties to the Executory Contract(s) affected thereby and to the parties on any master service list established by the Bankruptcy Court in the Chapter 11 Case. The fact that any contract or lease is listed in the Schedules to the Plan Supplement will not constitute or be construed to constitute an admission that such contract or lease is an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code or that Metex or any successor in interest to Metex (including Reorganized Metex) has any liability thereunder.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such (a) rejections, (b) assumptions, or (c) assumptions and assignments, as the case may be, as of the Effective Date, pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code.

2.      *Cure of Defaults.*

Generally, if there has been a default under an executory contract or unexpired lease (other than a default specified in section 365(b)(2) of the Bankruptcy Code), the debtor can assume the contract or lease only if the debtor cures the default.

Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any Executory Contract to be assumed (including any Executory Contract to be assumed and assigned) pursuant to Article 7.1 of the Plan, Reorganized Metex shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within thirty (30) days after the Effective Date, file and serve a pleading with the Bankruptcy Court listing the amount of the proposed Cure for each such Executory Contract. The non-Debtor party or parties to each such Executory Contract will have fifteen (15) days from service of the Cure Notice to object to the proposed Cure with respect to that Executory Contract. Within thirty (30) days after service of any objection to the proposed Cure for an Executory Contract, Metex shall (i) resolve such objection, which resolution will not require approval of the Bankruptcy Court, (ii) schedule a hearing before the Bankruptcy Court to determine the proper Cure for the Executory Contract, or (iii) determine to reject the Executory Contract, and provide notice thereof to the applicable non-Debtor party or parties.

3.      *Rejection Damages Claims.*

In the event that the rejection of an Executory Contract by Metex, pursuant to the Plan or otherwise, results in damages to the non-Debtor party or parties to such Executory Contract, a Claim for such damages shall be forever barred and shall not be enforceable against Metex, Reorganized Metex, or their respective properties or interests in property as agents, successors or assigns unless a Proof of Claim with respect to such damages is filed with the Bankruptcy Court and served upon counsel for Metex on or before (i) if such Executory Contract is rejected pursuant to Articles 7.1 and 7.2 of the Plan, the later of: (a) thirty (30) days after entry of the Confirmation Order or (b) fifteen (15) days after the non-Debtor party receives

notice of the rejection of such Executory Contract pursuant to Article 7.2 of the Plan; or (ii) if such Executory Contract is rejected pursuant to a Final Order of the Bankruptcy Court granting a motion filed by Metex to reject that Executory Contract, fifteen (15) days after entry of such order.

**C.      Effect of Confirmation.**

1.      *Revesting of Metex's Assets.*

On the Effective Date, pursuant to section 1141(b) of the Bankruptcy Code, except as otherwise provided in the Plan, the Plan Documents or the Confirmation Order, the property of the Estate of Metex (except for the Metex Asbestos PI Trust Contribution) shall vest in Reorganized Metex free and clear of any and all Liens, Claims, Encumbrances and other interests of any Entity.  From and after the Effective Date, Reorganized Metex may operate its business and may use, acquire, and dispose of property free of any restrictions imposed under the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court.  Without limiting the generality of the foregoing, Reorganized Metex may, without application to, or approval by, the Bankruptcy Court, pay Professional fees and expenses that Reorganized Metex incurs after the Effective Date.

2.      *Preservation of Certain Causes of Action; Defenses.*

Except as otherwise provided in Article 11.7 of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, Reorganized Metex, as successor in interest to Metex and its Estate, will retain and may enforce any and all rights, Claims, and Causes of Action accruing to or that are property of Metex or its Estate pursuant to the Bankruptcy Code or any statute or legal theory, including any rights to, Claims or Causes of Action for recovery under any policies of insurance issued to or on behalf of Kentile or Metex existing on the Effective Date and not assigned to the Asbestos PI Trust as part of Metex's PI Trust Contribution, and any rights, Claims, and Causes of Action against third parties related to or arising out of Allowed Claims.  Reorganized Metex will also retain and may enforce all defenses and counterclaims to all Claims asserted against Metex or its Estate, including, but not limited to, setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

Notwithstanding anything in Article 10.2 of the Plan to the contrary, on the Effective Date all Claims, defenses, rights and Causes of Action of Metex and Reorganized Metex relating to Asbestos PI Claims, including any Asbestos Insurance Rights existing on the Effective Date, will be transferred and assigned to the Asbestos PI Trust.  Except as otherwise provided in Article 10.2 of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Asbestos PI Trust will retain and may enforce such Asbestos PI Claims, defenses, rights and Causes of Action, including the Asbestos Insurance Rights existing on the Effective Date, and shall retain and may enforce all defenses and counterclaims to all Claims or Demands asserted against the Asbestos PI Trust with respect to such Asbestos PI Claims, including, but not limited to, setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code; *provided, however*, that no such defenses, Causes of Action, or counterclaims may be asserted against any Asbestos Protected Party (including but not limited to Metex Related Parties or Settling Asbestos Insurance Entities).  The Asbestos PI Trust will be deemed to be the appointed Estate

- 36-

representative to, and may, pursue, litigate, compromise and settle any rights, Claims, or Causes of Action transferred to it, as appropriate, in accordance with its and its beneficiaries' best interests.

Nothing in Article 10.2 of the Plan, however, will be deemed to be a transfer by Metex or Reorganized Metex of any Claims, rights, Causes of Action, or defenses relating to assumed Executory Contracts or which otherwise are required by Reorganized Metex to conduct its business in the ordinary course subsequent to the Effective Date.

3.      *Institution and Maintenance of Legal and Other Proceedings.*

From and after the Effective Date, Reorganized Metex will be empowered and entitled, in its sole and absolute discretion, to pursue, compromise or settle Reorganized Metex's interests in any insurance policy to the extent of coverage for an Asbestos Property Damage Claim or an Environmental Claim.

4.      *Insurance Neutrality.*

Notwithstanding anything to the contrary in the Plan (other than Articles 10.3 and 10.4 thereof), in any of the Plan Documents, or in the Confirmation Order, nothing in the Plan, the Plan Documents, or the Confirmation Order (including any other provision that purports to be preemptory or supervening) will in any way operate to, or have the effect of, impairing a Non-Settling Asbestos Insurance Entity's legal, equitable or contractual rights under an Asbestos Insurance Policy in any respect.  Subject to the foregoing, the rights of Non-Settling Asbestos Insurance Entities will be determined according to the terms of the Asbestos Insurance Policies, as applicable.

5.      *Terms of Injunction and Automatic Stay.*

All of the injunctions and/or stays in existence immediately prior to the Confirmation Date, whether pursuant to section 105, 362, or any other provision of the Bankruptcy Code, the Bankruptcy Rules or other applicable law issued in connection with the Chapter 11 Case shall remain in full force and effect until the injunction set forth in the Plan becomes effective, and shall continue to remain in full force and effect thereafter as and to the extent provided by the Plan, the Confirmation Order, or by their own terms.  In addition, on and after the Confirmation Date, Reorganized Metex may seek such further orders as it may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

Each of the injunctions contained in the Plan or the Confirmation Order will become effective on the Effective Date and will continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation Order.  All actions of the type or nature of those to be enjoined by such injunctions will be enjoined during the period between the Confirmation Date and the Effective Date.

6.      *No Liability for Certain Released Claims.*

Except as otherwise expressly provided in Article 10.6 of the Plan or the Confirmation Order, neither Metex, Reorganized Metex, the other Asbestos Protected Parties, nor the Asbestos PI Trust (except, as it relates to the Asbestos PI Trust, with respect to the Asbestos PI Claims) does, or shall be deemed to, assume, agree to perform, pay, or indemnify creditors for any liabilities or obligations of Metex relating to or arising out of the operations of or assets of Kentile or Metex whether arising prior to or resulting from actions, events, or circumstances occurring or existing at any time prior to the Effective Date.

7.      *Dissolution of Committee; Creation of the Asbestos PI Trust Advisory Committee; Continuation of Future Claimants' Representative.*

On the Effective Date, the Asbestos Claimants Committee appointed in the Chapter 11 Case will be dissolved automatically, whereupon its members, Professionals, and agents will be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except with respect to applications for compensation by Professionals or reimbursement of expenses incurred as a member of any committee and any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order or pending appeals of any other order entered in the Chapter 11 Case.

As provided in Article 9.2 of the Plan, the Confirmation Order will provide for the establishment of the Asbestos PI Trust and for the appointment of the Asbestos PI Trust Advisory Committee, effective as of the Effective Date.  From and after the Effective Date, the Future Claimants' Representative will continue to serve as provided in the Plan and the Asbestos PI Trust Documents, to perform the functions specified and required therein.

8.      *Closing of Kentile's 1992 Chapter 11 Case.*

Unless provided otherwise in the Confirmation Order, all adversary proceedings filed in Kentile's 1992 Chapter 11 Case, including those initiated by either Metex or the Kentile Insurers, will be dismissed with prejudice, and Kentile's 1992 Chapter 11 Case will be closed.

**D.      Releases, Injunctions and Discharges.**

1.      *Discharge of Metex.*

Except as otherwise provided in Articles 4.1, 4.2, 4.3, 4.5, 4.6, and 11.9 of the Plan, as of the Effective Date, the rights provided in the Plan will be in exchange for and in complete satisfaction, settlement and discharge of, all Claims or Demands against Kentile, Metex or Reorganized Metex or any of their respective assets and properties.

Specifically, except as provided in Articles 4.1, 4.2, 4.3, 4.5, 4.6 and 11.9 of the Plan, pursuant to section 1141(d)(1)(A) of the Bankruptcy Code, confirmation of the Plan will discharge Metex and Reorganized Metex from any and all Claims or Demands of any nature whatsoever, including, without limitation, all Claims, Demands, and liabilities that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, whether or not:  (a) a Proof of Claim based on such Claim or Demand was

- 38-

filed under section 501 of the Bankruptcy Code, or such Claim or Demand was listed on any Schedules of Metex; (b) such Claim or Demand is or was allowed under section 502 of the Bankruptcy Code; or (c) the holder of such Claim or Demand has voted on or accepted the Plan.

2.      *Discharge Injunction.*

*Except as otherwise provided in Articles 4.1, 4.2, 4.3, 4.5, 4.6, and 11.9 of the Plan, all persons or Entities that have held, hold or may hold Claims or Demands will be permanently enjoined, from and after the Effective Date, from:*

*(i) commencing or continuing in any manner any action or other proceeding of any kind against Reorganized Metex with respect to such Claim or Demand;*

*(ii)     enforcing, attaching, collecting, or recovering in any manner or by means of any judgment, award, decree, or order against Reorganized Metex with respect to such Claim or Demand;*

*(iii)    creating, perfecting, or enforcing any Encumbrance of any kind against Reorganized Metex or against the property or interests in property of Reorganized Metex with respect to such Claim or Demand;*

*(iv)     asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to Reorganized Metex or against the property or interests in property of Reorganized Metex, with respect to such Claim or Demand; and*

*(v)     pursuing any Claim or Demand released pursuant to the Plan.*

*Such injunction will extend to the successors of Metex (including, without limitation, Reorganized Metex) and their respective properties and interests in property.*

3.      *Exculpation.*

The Released Parties consist of (i) Metex; (ii) the Asbestos Claimants Committee; (iii) Reorganized Metex; (iv) the Future Claimants' Representative; (v) the Asbestos Protected Parties; (vi) the Asbestos PI Trustee; (vii) UCC; and (viii) any current or former Representative of the foregoing.

Such Released Parties are exculpated under the Plan with regard to any act or omission in connection with, related to, or arising out of:  (i) the Chapter 11 Case; (ii) pursuit of confirmation of the Plan; (iii) consummation of the Plan, or administration of the Plan or the property to be distributed under the Plan or the Asbestos PI Trust Distribution Procedures; (iv) the Plan; and (v) the negotiation, formulation and preparation of the Plan, the Plan Documents and any of the terms and/or settlements and compromises reflected in the Plan and the Plan Documents, except for such acts or omissions determined by a Final Order to constitute willful misconduct or gross negligence.

4.    *Release of Metex's Officers and Directors.*

        The acceptance of any Distribution by a holder of a Claim or Demand against Metex, and, with respect to Asbestos PI Claims, the acceptance of payment from the Asbestos PI Trust by a holder of an Asbestos PI Claim, will constitute a waiver and release of any and all Causes of Action that such holder did commence or could have commenced against any former or current officer or director of Metex (serving in such capacity) from and after the Commencement Date that is based upon, attributable to, or arising from any acts or omissions of such officer or director occurring prior to the Effective Date, to the fullest extent permitted under applicable law (as now in effect or subsequently extended), except for willful misconduct or gross negligence as determined by a Final Order.

5.    *Asbestos PI Channeling Injunction.*

        **(a)    *Parties Covered by the Asbestos PI Channeling Injunction.***

        ***Pursuant to the Asbestos PI Channeling Injunction and the Plan, the following entities will be "Asbestos Protected Parties" protected by the scope of the Asbestos PI Channeling Injunction:***

- ***Metex, Reorganized Metex, and each Metex Related Party;***
- ***any Settling Asbestos Insurance Protected Party (generally, any Asbestos Insurance Entity that has entered into an Insurance Settlement Agreement and Entities related to such Entity); and***
- ***any Representative or Shareholder of each of the foregoing solely in their capacity as such.***

        **(b)    *Terms of the Asbestos PI Channeling Injunction.***

        ***Pursuant to the Confirmation Order and section 524(g) of the Bankruptcy Code, and subject to Article 11.5 of the Plan, as more fully described in Section IX.D.6 below, the sole recourse of any holder of an Asbestos PI Claim on account of such Asbestos PI Claim or part thereof will be against the Asbestos PI Trust. Each such holder will be enjoined from taking legal action directed against Metex, Reorganized Metex, or any other Asbestos Protected Party described above, or their respective property, for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to such Asbestos PI Claim.***

6.    *Limitations of the Asbestos PI Channeling Injunction.*

        Notwithstanding anything to the contrary above, the releases in the Plan and the Asbestos PI Channeling Injunction will not enjoin:

        (a) the rights of Entities to the treatment accorded to them under Articles III and IV of the Plan, as applicable, including the rights of Entities with Asbestos PI Claims to assert

such Asbestos PI Claims against the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures;

(b)    the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Asbestos PI Trust Expenses against the Asbestos PI Trust; and

(c)    the rights of Reorganized Metex to take action with respect to any remaining insurance in connection with an Asbestos Property Damage Claim or an Environmental Claim.

7.    *Insurance Policy Injunction.*

*In addition to the Asbestos PI Channeling Injunction, it is contemplated that the Bankruptcy Court will issue an injunction in connection with each Insurance Settlement Agreement that will prohibit any holder of a Claim or Demand from suing a Settling Asbestos Insurance Entity for any matter attributable to, or in connection with, an Asbestos Insurance Policy or Other Insurance Policy (as defined in the Plan, an "__Insurance Policy Injunction__").*

8.    *Preexisting Injunctions and Discharges.*

*Various injunctions were issued in connection with Kentile's 1998 Plan which channeled "Asbestos Claims" and "Environmental Claims" (each as defined in Kentile's 1998 Plan) to Kentile's insurance. In connection with such channeling the Bankruptcy Court issued injunctions to prevent such claims from being asserted against Kentile and Metex. Such injunctions, to the extent not inconsistent with the Asbestos PI Channeling Injunction and the Insurance Policy Injunction, will remain in full force and effect. In addition, as part of Kentile's 1992 Chapter 11 Case, certain Claims were discharged or otherwise barred, including, without limitation, pursuant to the terms of Kentile's 1998 Plan. Other than Asbestos PI Claims, the recourse for which shall be the Asbestos PI Trust, nothing in the Plan shall be deemed to modify, revive, reinstate, or otherwise grant a right on behalf of any Claims that were previously barred or otherwise discharged in connection with Kentile's 1992 Chapter 11 Case and/or Kentile's 1998 Plan.*

E.    **Release of Avoidance Actions.**

Article 11.7 of the Plan provides that Metex will release all Avoidance Actions that include, among other things, actions related to preferential transfers, fraudulent conveyances, and similar Claims owned by Metex solely as the result of its status as a Debtor in Possession. As a consequence, this release includes a release by Metex and Reorganized Metex of Claims that it may have against UCC and the other Metex Related Parties, including the Asserted Claims.

F.    **Miscellaneous Provisions.**

The Plan contains provisions relating to corporate actions, delivery of distributions, manner of payment, vesting of assets, binding effect, terms of injunctions or stays, payment of statutory fees, substantial consummation, compliance with tax requirements,

revocation and amendment of the Plan, governing law, and timing. For more information regarding these items, see the Plan attached hereto as Exhibit 1.

## X.

### Metex's Business, Financial Information & Projections

**A.    Description of Metex's Current Business.**

Metex's only business is the ownership of two separate industrial buildings in Edison, New Jersey, which it leases to two subsidiaries of UCC. The leases expire in 2033 (but may be terminated earlier upon notice by the tenant), are triple net leases, and generate a current combined annual rental to Metex of approximately $750,000. Both properties are subject to ongoing environmental remediation which consumes a portion of these revenues.

**B.    Projections.**

As a condition to confirmation of the Plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of Reorganized Metex. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this "feasibility" requirement of section 1129(a)(11) of the Bankruptcy Code, Metex's management has analyzed the ability of Metex to meet its obligations under the Plan while retaining sufficient liquidity and capital resources to conduct its business after the Effective Date.

The projected pro forma balance sheets and projected financial performance (the "Projections") for Reorganized Metex, which are attached as Exhibit 3 to this Disclosure Statement, should be read in conjunction with Section XII below, entitled "Certain Factors to Be Considered," and with the assumptions, qualifications and footnotes to the tables containing the Projections set forth in Exhibit 3 to the Disclosure Statement, and the historical consolidated financial information (including the notes and schedules thereto) attached as Exhibit 2 to the Disclosure Statement.

The Projections were not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants, the practices recognized to be in accordance with Generally Accepted Accounting Principles, or the rules and regulations of the Securities and Exchange Commission regarding projections. Furthermore, the Projections have not been audited by an independent accountant.

Metex does not intend, and disclaims any obligation to furnish updated projections to holders of Claims prior to or after the Effective Date.

The Projections are based on, and assume the successful implementation of, the Plan. The Projections have been prepared exclusively by Metex's management. The Projections, while presented with numerical specificity, are necessarily based on a variety of estimates and assumptions that, though considered reasonable by management at the time made, may prove not to be accurate, and are inherently subject to significant business, economic and

competitive uncertainties and contingencies, many of which are beyond Metex's control. Metex cannot make any representations as to Reorganized Metex's ability to achieve the results set forth in the Projections. Some assumptions on which the Projections are based may not materialize, and events and circumstances occurring subsequent to the date on which the Projections were prepared may be different from those assumed or anticipated, and may materially and adversely impact Reorganized Metex's future financial performance. The Projections, therefore, cannot be relied upon as a guarantee or other assurance of Reorganized Metex's actual future financial performance.

**C.    Liquidation Valuation Analysis.**

The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that the Bankruptcy Court find that with respect to an impaired Class (such as Class 4) that each holder of a Claim in such Class has accepted the plan or is receiving more than such holder would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. A liquidation value analysis for Metex (the "Liquidation Analysis") is attached as Exhibit 4 hereto which demonstrates that holders of Class 4 Asbestos PI Claims are receiving more under the Plan than they would in a Chapter 7 liquidation.

## XI.

### Governance of Reorganized Metex

**A.    Management of Reorganized Metex.**

Reorganized Metex will be managed by Anthony J. Miceli, who will be the sole Director, President, and Treasurer of Metex.

**B.    Corporate Governance.**

The Amended Certificate of Incorporation of Reorganized Metex shall be included in a Plan Supplement.

## XII.

### Certain Factors to Be Considered

**A.    Certain Bankruptcy Considerations.**

Although Metex believes that the Plan satisfies all requirements necessary for confirmation by the Bankruptcy Court, and/or issuance or acceptance and affirmance by the District Court, there can be no assurance that the Bankruptcy Court and/or the District Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications will not necessitate the re-solicitation of votes. In addition, although Metex believes that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.

For the Plan to be confirmed, at least two-thirds (2/3) in amount and seventy-five percent (75%) in number of the holders of Asbestos PI Claims who vote must vote to accept/in favor of the Plan.

**B.      Risk Factors.**

Holders of Claims against and Equity Interests in Metex should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or referred to herein by reference), prior to voting to accept or reject the Plan.  These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

1.      *Overall Risks to Recovery by Holders of Claims.*

The ultimate recoveries under the Plan to holders of Claims (other than holders whose entire Distribution is paid in Cash or holders of Asbestos PI Claims that will be resolved by the Asbestos PI Trust) depend upon a number of factors.  The factors below (other than the factor entitled "Certain Bankruptcy Considerations") assume that the Plan is confirmed and that the Effective Date occurs on or about July 31, 2014.  Prior to voting on the Plan, each holder of a Claim should consider carefully the risk factors specified or referred to below, including the exhibits annexed hereto, as well as all of the information contained in the Plan.

2.      *Certain Bankruptcy Considerations.*

Although Metex believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no guarantee that the Bankruptcy Court will reach the same conclusion, or that the Confirmation Order, if challenged on appeal, will be affirmed.  There also can be no assurance that the Plan as proposed will be accepted by the requisite number of holders or amount of Claims, that the Plan will not be modified up to and including the Confirmation Date, or that the Bankruptcy Court will enter an order confirming the Plan containing the findings of fact and conclusions of law that are conditions precedent to confirmation of the Plan.  There also can be no assurance that the District Court will accept and affirm or issue the order confirming the Plan, that such acceptance and affirmance or issuance will become a Final Order and that the Asbestos PI Channeling Injunction will therefore become valid and enforceable.

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Case will continue rather than be converted to a liquidation, or that any alternative plan of reorganization would be on terms as favorable to the holders of Claims and Equity Interests as the terms of the Plan.  If a liquidation or protracted reorganization were to occur, there is a substantial risk that the value of Metex's assets would be substantially eroded to the detriment of all stakeholders.

3.      *Projected Financial Information.*

The Projections are dependent upon numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future

performance of Reorganized Metex, general business and economic conditions, and other matters, many of which are beyond the control of Metex. Accordingly, there can be no assurance that such assumptions will prove to be valid. In addition, unanticipated and unforeseeable events and/or circumstances occurring subsequent to the preparation of the Projections may affect the actual financial results of Reorganized Metex. Although Metex believes that the projections are reasonable and attainable, some or all of the estimates will vary, and variations between the actual financial results and those projected may be material.

4.      *Appointment of Asbestos PI Trustee and/or Members of the Asbestos PI Trust Advisory Committee for the Asbestos PI Trust.*

At the Confirmation Hearing, Metex will request that the Bankruptcy Court appoint the individual chosen to serve as the initial Asbestos PI Trustee of the Asbestos PI Trust, and certain Persons or Entities chosen to serve as the initial members of the Asbestos PI Trust Advisory Committee. The Bankruptcy Court, however, may reject or otherwise decline to appoint the individual chosen to serve as the Asbestos PI Trustee or one or more of the proposed members of the Asbestos PI Trust Advisory Committee. In that case, one or more alternate Persons or Entities would have to be nominated, potentially resulting in significant delays in the occurrence of the Confirmation Date and Effective Date. The selection of a different Asbestos PI Trustee or different Asbestos PI Trust Advisory Committee members also could materially affect administration of the Asbestos PI Trust.

5.      *Distributions under the Asbestos PI Trust Distribution Procedures.*

There can be no certainty as to the precise amounts that will be distributed by the Asbestos PI Trust in any particular time period or when Asbestos PI Claims will be paid by the Asbestos PI Trust. Payments that will be made on Asbestos PI Claims will be determined under the Asbestos PI Trust Distribution Procedures and will be based, on the one hand, on estimates of the number, types, and amount of current Asbestos PI Claims and expected future Demands, and on the other hand, the value of the assets of the Asbestos PI Trust, the liquidity of the Asbestos PI Trust, the Asbestos PI Trust's expected future income and expenses, and other matters that are likely to affect the sufficiency of funds to pay all holders of Asbestos PI Claims and Demands.

The initial payment percentage has been set at 18% and was developed by comparing the assets of the Asbestos PI Trust against its projected liability for Asbestos PI Claims and Asbestos PI Trust Expenses. The Asbestos PI Trust's projected liability for Asbestos PI Claims is based on a number of assumptions, including the assumption that the rate at which the Asbestos PI Trust approves claims for payment will remain consistent with the rate at which the Debtor previously settled and paid Asbestos PI Claims. Should any assumption from which the initial payment percentage was developed prove to be materially inaccurate based on the Asbestos PI Trust's actual experience, the Asbestos PI Trust may have to adjust the payment percentage upwards or downwards from time to time, pursuant to the provisions of the Asbestos PI Trust Distribution Procedures and the Asbestos PI Trust Agreement, to reflect current estimates of the Asbestos PI Trust's assets and liabilities.

6.      *Post-Consummation Metex.*

At the Confirmation Hearing, the Bankruptcy Court will be required to make a determination that the Plan is feasible (i.e., not likely to be followed by the liquidation, or the need for further financial reorganization, of Reorganized Metex) in order to confirm the Plan. Metex's sole assets consist of two industrial properties in Edison, New Jersey, which are currently leased to certain affiliates of Metex, Metal Textiles Corporation and AFP Transformer Corporation, under triple net leases that expire in 2033 (but may be terminated earlier upon notice by the tenant).

7.      *The Asbestos PI Channeling Injunction.*

The Asbestos PI Channeling Injunction, which, among other things, bars the assertion of any Asbestos PI Claims or Demands against Metex and Reorganized Metex and the other Asbestos Protected Parties, is the cornerstone of the Plan.  In 1994, the United States Congress added subsection (g) to section 524 of the Bankruptcy Code in order to confirm the authority of the Bankruptcy Court, subject to the conditions specified therein, to issue injunctions such as the Asbestos PI Channeling Injunction with respect to present and future asbestos-related personal injury, wrongful death and related Claims and demands.  Although the Plan, the Asbestos PI Trust Agreement, and the Asbestos PI Trust Distribution Procedures all have been drafted with the intention of complying with section 524(g) of the Bankruptcy Code, and satisfaction of the conditions imposed by section 524(g) is a condition precedent to confirmation of the Plan, there is no guarantee that the validity and enforceability of the Asbestos PI Channeling Injunction or section 524(g) or the application of the Asbestos PI Channeling Injunction to Asbestos PI Claims will not be challenged, either before or after confirmation of the Plan.  Although Metex believes adequate bases exist for the courts to uphold section 524(g) and the Asbestos PI Channeling Injunction, there can be no assurance that, in the future, courts might not invalidate all or a portion of section 524(g) or the Asbestos PI Channeling Injunction.

## XIII.

## Voting Procedures

Detailed voting instructions are provided with the Ballot accompanying this Disclosure Statement.  For purposes of the Plan, the following Classes are the only ones entitled to vote:

| Class | Description |
|-------|-------------|
| 4 | Asbestos PI Claims |

For purposes of the Plan, the following Classes are NOT entitled to vote:

| Class | Description |
|---|---|
| 1 | Priority Claims |
| 2 | Secured Claims |
| 3 | General Unsecured Claims (other than Asbestos PI Claims, Asbestos Property Damage Claims and Environmental Claims) |
| 5 | Asbestos Property Damage Claims |
| 6 | Environmental Claims |
| 7 | Equity Interests in Metex |

If your Claim is not in Class 4, you are not entitled to vote on the Plan and you will not receive a Ballot with this Disclosure Statement.  If you are a holder of a Claim in Class 4, you should read your Ballot and follow the listed instructions carefully.  Please use only the Ballot that accompanies this Disclosure Statement.

**IF YOU HAVE ANY QUESTIONS CONCERNING THE BALLOT, YOU MAY CONTACT THE BALLOTING AGENT:**

> Metex Ballot Processing Center
> Logan & Company, Inc.
> 546 Valley Road
> Upper Montclair, New Jersey 07043
> (973) 509-3190
> metex@loganandco.com

**A.      Vote Required for Acceptance by a Class.**

Under the Bankruptcy Code, acceptance of a plan by a Class of Claims is determined by calculating the number and the amount of Claims voting to accept, based on the total of Allowed Claims actually voting.  Typically, acceptance requires an affirmative vote of more than one-half (1/2) in number of the total allowed Claims voting and two-thirds (2/3) in amount of the total allowed Claims voting.  However, section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code provides that, for a debtor to establish an Asbestos PI Trust and receive the benefit of an injunction that channels liability for asbestos-related Claims to the Asbestos PI Trust, at least seventy-five percent (75%) in number of the holders of Claims that are to be addressed by the Asbestos PI Trust must vote to accept/in favor of the Plan.  Accordingly, it is a condition to confirmation of the Plan that at least seventy-five percent (75%) of the holders of Asbestos PI Claims in Class 4 who actually vote on the Plan must vote to accept/in favor of the Plan. In addition, the Plan must be approved by two-thirds (2/3) in amount of Asbestos PI Claims voting on the Plan.

- 47-

B.      **Class 4 Temporary Allowance For Voting Purposes.**

          To determine the amount of Claims voting on the Plan, the Bankruptcy Court, by way of the Solicitation Procedures Order, has temporarily allowed Claims for voting purposes only in the following amounts:

| Disease Category | Temporary Allowance For Voting |
|---|---|
| Mesothelioma | $135,000 |
| Lung Cancer 1 | $65,000 |
| Lung Cancer 2 | $15,000 |
| Other Cancers | $17,500 |
| Severe Asbestosis | $65,000 |
| Asbestosis/Pleural Disease | $5,500 |
| Asbestos Pleural Disease (II) | $2,500 |
| Other Asbestos Disease | $100 |

          In addition, by way of the Solicitation Procedures Order, the Bankruptcy Court has temporarily allowed, for voting purposes only, Indirect Asbestos PI Claims, each in the amount of $1.00 in the aggregate per claimant.

          Pursuant to section 1126(e) of the Bankruptcy Code, Metex or any other party in interest may petition the Bankruptcy Court to "designate" (*i.e.*, disqualify from the vote count) a vote on the Plan that was not in good faith.

C.      **Classes Deemed to Accept.**

          Under the Bankruptcy Code, holders of Claims or Equity Interests that are not Impaired by the Plan are deemed to accept the Plan and solicitation of such holders is not required.  Because holders of Claims in Class 1 (Priority Claims), Class 2 (Secured Claims), Class 3 (General Unsecured Claims), Class 5 (Asbestos Property Damage Claims), Class 6 (Environmental Claims), and Class 7 (Equity Interests) are not Impaired under the Plan.  The holders thereof are deemed to accept the Plan, and are not entitled to vote.

D.      **Voting Deadline.**

          In order for your vote to be counted, it must be actually received by the Balloting Agent at the following address before the Voting Deadline of 5:00 p.m., Eastern Time, on May 2, 2014:

- 48-

| Balloting Agent |
| --- |
| Metex Ballot Processing Center |
| Logan & Company, Inc. |
| 546 Valley Road |
| Upper Montclair, New Jersey 07043 |
| (973) 509-3190 |

If the instructions on your Ballot require you to return the Ballot to your attorneys, you must deliver your Ballot to them in sufficient time for them to process it and return it to the Balloting Agent before the Voting Deadline. If a Ballot is damaged or lost, you may contact Metex's Balloting Agent at the number set forth above. Any Ballot that is executed and returned but that does not indicate an acceptance or rejection of the Plan will not be counted.

## XIV.

## Confirmation of the Plan

### A.    Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization. On February 25, 2014, the Bankruptcy Court issued the Solicitation Procedures Order setting the hearing on confirmation of the Plan and for approval of the Insurance Settlement Agreements for May 22, 2014 at 10:00 ET. The Bankruptcy Court approved the manner of service of notice of the hearing on confirmation of the Plan and for approval of the Insurance Settlement Agreements in the Solicitation Procedures Order.

### B.    General Requirements of Section 1129.

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

1.    The Plan complies with the applicable provisions of the Bankruptcy Code.

2.    Metex has complied with the applicable provisions of the Bankruptcy Code.

3.    The Plan has been proposed in good faith and not by any means proscribed by law.

4.    Any payment made or promised by Metex or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been or will be approved by the Bankruptcy Court.

5.    Metex has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of Metex or a successor to Metex under the Plan. The appointment of (or continuance by) such

individual to (or in) such position or office is consistent with the interests of creditors and equity security holders and with public policy. Metex has disclosed the identity of any insider that will be employed or retained by Metex, and the nature of any compensation for such insider.

6.      With respect to each Class of Claims or Equity Interests, each holder of an impaired Claim or impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if Metex were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test," below.

7.      Each Class of Claims and Equity Interests has either accepted the Plan or is not Impaired under the Plan.

8.      Except to the extent that the holder of a particular Claim has agreed to different treatment of such Claim, the Plan provides that Administrative Expense Claims and Priority Claims (other than Priority Tax Claims) will be paid in full on the Effective Date. Priority Tax Claims, if any, will be paid, over a period not exceeding five years after the date of the order for relief, in regular installments of Cash payments, equal to the Allowed amount of such Claim (as of the Effective Date) and in a manner no less favorable than the most favored non-priority unsecured Claim provided for by the plan, and, with respect to a secured Claim that would otherwise meet the description of an unsecured Claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code, but for the secured status of that Claim, the holder of that Claim will receive on account of that Claim, Cash payments, in the same manner as described in this paragraph.

9.      At least one Class of Impaired Claims has accepted the Plan, with the determination of such Class acceptance not including any acceptance of the Plan by any insider holding a Claim in such Class.

10.     Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of Metex or any successor to Metex under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility," below.

## C.      Best Interests Test.

As described above, the Bankruptcy Code requires that each holder of an impaired Claim or Equity Interest either (i) accept the Plan; or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if Metex was liquidated under chapter 7 of the Bankruptcy Code.

Metex's Liquidation Analysis is attached hereto as Exhibit 4. When the results of the liquidation analysis are compared to the distributions expected under the Plan, as set forth in

Section VI, it is clear that every creditor and interest holder will receive at least as much under the Plan as such creditor or interest holder would receive in a chapter 7 liquidation.

**D.    Feasibility.**

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization of the debtor.  In connection with the development of the Plan and for the purpose of determining whether the Plan satisfies this feasibility standard, Metex has analyzed its ability to meet its obligations under the Plan.  As part of this analysis, Metex has prepared Projections, as described above and set forth on Exhibit 3.  Based on such Projections, Metex believes that Reorganized Metex will be able to make all payments required pursuant to the Plan and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

**XV.**

**Certain Federal Income Tax Consequences of the Plan**

**CIRCULAR 230 NOTICE:    TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE ("IRS") CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT:  (I) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS AND EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER FEDERAL, STATE, OR LOCAL TAX LAWS, (II) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN, AND (III) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN TO METEX, REORGANIZED METEX, HOLDERS OF ASBESTOS PI CLAIMS, AND THE ASBESTOS PI TRUST.  THE FOLLOWING SUMMARY DOES NOT DISCUSS THE FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS WHOSE CLAIMS ARE ENTITLED TO PAYMENT IN FULL IN CASH OR ARE OTHERWISE UNIMPAIRED UNDER THE PLAN OR TO HOLDERS OF EQUITY INTERESTS OR INTERCOMPANY CLAIMS.**

**THE FOLLOWING SUMMARY IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "INTERNAL REVENUE CODE"), TREASURY REGULATIONS PROMULGATED THEREUNDER, JUDICIAL DECISIONS AND PUBLISHED ADMINISTRATIVE RULES AND PRONOUNCEMENTS OF THE IRS AS IN EFFECT ON THE DATE HEREOF. CHANGES IN SUCH RULES OR NEW INTERPRETATIONS THEREOF MAY HAVE**

**RETROACTIVE EFFECT AND COULD SIGNIFICANTLY AFFECT THE FEDERAL INCOME TAX CONSEQUENCES DESCRIBED BELOW.**

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND ARE SUBJECT TO SIGNIFICANT UNCERTAINTIES. METEX DOES NOT CURRENTLY INTEND TO SEEK A RULING FROM THE IRS CONCERNING ANY OF THE TAX ASPECTS OF THE PLAN. IN ADDITION, THIS SUMMARY DOES NOT ADDRESS FOREIGN, STATE, OR LOCAL TAX CONSEQUENCES OF THE PLAN, NOR DOES IT PURPORT TO ADDRESS THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO SPECIAL CLASSES OF TAXPAYERS (SUCH AS FOREIGN TAXPAYERS, BROKER-DEALERS, BANKS, MUTUAL FUNDS, INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, THRIFTS, SMALL BUSINESS INVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES, REAL ESTATE INVESTMENT COMPANIES, TAX-EXEMPT ORGANIZATIONS, TRADERS IN SECURITIES THAT ELECT TO USE A MARK-TO-MARKET METHOD OF ACCOUNTING FOR THEIR SECURITY HOLDING AND PASS-THROUGH ENTITIES AND INVESTORS IN SUCH ENTITIES).**

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR EQUITY INTEREST. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE TO THEM UNDER THE PLAN.**

A.    **Consequences to Metex.**

Metex currently is treated as a "C" corporation for federal income tax purposes. Metex generally should take into account its shares of any taxable income, gain, losses and deductions, including any cancellation of indebtedness income ("COD"), recognized by Metex pursuant to the implementation of the Plan. COD, which is the amount by which discharged indebtedness exceeds the consideration received in exchange therefor, is generally includible in a debtor's gross income, subject to certain exceptions. For example, a debtor generally does not realize COD if the payment of the discharged indebtedness would have given rise to a deduction. In addition, any COD realized by a debtor in a bankruptcy case generally is excluded from the debtor's gross income, and the bankrupt debtor must reduce certain tax attributes by the amount of the excluded COD (the "Bankruptcy COD Exception").

B.    **Treatment of Metex's Contribution to the Asbestos PI Trust and Taxation of the Asbestos PI Trust.**

It is currently intended that the Asbestos PI Trust will constitute a "qualified settlement fund" within the meaning of section 468B of the Internal Revenue Code and the Treasury regulations promulgated thereunder. The applicable Treasury regulations provide that to be treated as a qualified settlement fund, a fund, account, or trust must be (i) established

pursuant to an order of, or be approved by, a government authority, including a court, and must be subject to the continuing jurisdiction of that government authority, (ii) established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event or a related series of events that has occurred and that has given rise to at least one claim asserting, among other things, liability under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. 9601 et seq., or liability arising out of, a tort, breach of contract or violation of law, and (iii) be a trust under applicable state law or have its assets physically segregated from the other assets of the transferor and persons related to the transferor.

A transferor generally is entitled to a current federal income tax deduction for all transfers of cash and other property (other than its own notes) to a qualified settlement fund to the same extent the transferor would have been entitled to a deduction if such amounts had been paid directly to the holder of a claim that will be discharged upon the establishment of the qualified settlement fund. Assuming the Asbestos PI Trust is treated as a qualified settlement fund, the Board of Directors of Metex intends to cause Metex to claim a current federal income tax deduction for transfers of Cash to the Asbestos PI Trust to the same extent Metex would have been entitled to a deduction if such amounts had been paid directly to the holder of an Asbestos PI Claim. In connection therewith, Metex generally will not be entitled to a deduction to the extent that it funds the Asbestos PI Trust with Cash attributable to amounts not included in its income.

Assuming the Asbestos PI Trust is treated as a qualified settlement fund, the Asbestos PI Trust will generally be subject to a separate entity level tax at the maximum rate applicable to trusts and estates, and, in determining the taxable income of the Asbestos PI Trust, (i) any amounts transferred to the Asbestos PI Trust to resolve or satisfy a liability for which the Asbestos PI Trust is established generally will be excluded from the Asbestos PI Trust's income, and (ii) administrative costs (including state and local taxes) incurred by the Asbestos PI Trust generally will be deductible.

Assuming the Asbestos PI Trust is treated as a qualified settlement fund, trade or business expenses generally will not be deductible for federal income tax purposes. In general, the adjusted tax basis of property received (or treated as received for federal income tax purposes) by a qualified settlement fund from a transferor pursuant to the Plan will be the fair market value of such property at the time of receipt.

## C.    Consequences to Holders of Asbestos PI Claims

Each Asbestos PI Claim will be liquidated and satisfied in cash from the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures. The federal income tax treatment of the receipt of payments from the Asbestos PI Trust by a holder of such an Asbestos PI Claim generally will depend upon the nature of the Asbestos PI Claim. Because the amounts received by a holder of an Asbestos PI Claim (other than an Indirect Asbestos PI Claim or an Asbestos PI Trust Expense) generally will be attributable to, and compensation for, such holder's personal physical injuries or sickness, within the meaning of section 104 of the Internal Revenue Code, any such amounts received by the holder generally should be nontaxable. However, to the extent payments from the Asbestos PI Trust to a holder of an Asbestos PI Claim

- 53-

are attributable to medical expense deductions allowed under section 213 of the Internal Revenue Code for a prior taxable year, such payments will be taxable as ordinary income to the recipient. To the extent that the payments from the Asbestos PI Trust to holders of Asbestos PI Claims constitute amounts received on account of claims other than personal injury or sickness, such payments generally will be includable in the gross income of such holders.

## D.      Information Reporting and Withholding.

All distributions to holders of Asbestos PI Claims under the Plan are subject to any applicable information reporting and withholding. Under federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable rate. Backup withholding generally applies if the holder (i) fails to furnish its Social Security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

## XVI.

### Conclusion

The Plan Proponents believe that the Plan is in the best interests of all of Metex's creditors and equity holders and therefore urge the holders of Asbestos PI Claims in Class 4 to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received by the Balloting Agent not later than 5:00 p.m. Eastern Time on May 2, 2014.

Dated:  February 25, 2014                    METEX MFG. CORPORATION

                                             By:  */s/ Anthony J. Miceli*
                                                  Anthony J. Miceli
                                                  President

                                             ASBESTOS CLAIMANTS COMMITTEE

                                             By:  */s/ Peter Van N. Lockwood*
                                                  Peter Van N. Lockwood
                                                  Counsel to Asbestos Claimants Committee

                                             FUTURE CLAIMANTS' REPRESENTATIVE

                                             By:  */s/ Lawrence Fitzpatrick*
                                                  Lawrence Fitzpatrick

- 54-